*In re* MARRIAGE OF JANICE V. MOUSCHOVIAS, Petitioner-Appellee, and TELEMACHOS CH. MOUSCHOVIAS, Respondent-Appellant.

Fourth District   Nos. 4—03—1038, 4—04—0063 cons.

Opinion filed July 14, 2005.—Rehearing denied August 9, 2005.

APPLETON, J., dissenting.

Telemachos Ch. Mouschovias, of Urbana, *pro se.*

Sarah B. Tinney, of Erwin, Martinkus & Cole, Ltd., of Champaign, for Janice V. Mouschovias.

PRESIDING JUSTICE COOK delivered the opinion of the court:

Petitioner, Janice V. Mouschovias, and respondent, Telemachos Ch. Mouschovias, were married June 20, 1987. Three children were born as a result of the marriage, Alexander, born August 30, 1991, Margarita, born September 14, 1993, and Adonis, born May 22, 1996. Janice filed a petition for dissolution of marriage on September 17, 1996. On October 28, 2003, the court entered its final order on all remaining issues. Telemachos appeals. Janice cross-appeals. We affirm.

## I. BACKGROUND

Janice, age 43, has a bachelor of science degree in physical education. She and the children reside in a single-family dwelling in Urbana, Illinois. She rents the dwelling from a land trust owned by her father. The court found that Janice was a "super hardworking primary caretaker of the home and the children." The court found that Janice, relatively young and in good health, is clearly capable of supporting

herself. During the 2002-03 school year, she was employed full-time at a local Catholic high school, at an annual salary of $24,307.

Telemachos, age 57, is a tenured professor at the University of Illinois (University), teaching in two departments (physics and astronomy). He continues to reside in the former marital residence in Urbana, which is his nonmarital property. The trial court found Telemachos to be "the super hardworking primary breadwinner in the family" and "an astute financial investor." Telemachos has a pension plan administered by the State Universities Retirement System (SURS). He was first certified into the system August 21, 1980. Telemachos earned between $90,000 and $100,000 per year from the University.

The trial court noted that the parties engaged in one of the most miserly standards of living imaginable considering their income and assets. The court referred to testimony regarding the disrepair of appliances in the household, the lack of heat in the home, the fact that Janice did not have money to purchase necessary food items and had to submit receipts to be reimbursed for even minor household expenses, Janice's lack of a vehicle for 14 months, Telemachos's use of a 1980 vehicle that was highly unreliable and unsafe for the children, and the high state of disrepair and environmental hazards in the home. The year preceding the parties' separation, the annual family expenses were a "miserly $22,000 for a family of five with a husband earning a substantial University income" and holdings of over $2 million in liquid assets.

The trial court denied Janice maintenance, noting the parties only lived together for nine years followed by five years of litigation; Janice had received "minimal" temporary maintenance of $500 per month during the litigation. The court also noted that as a part of its order Janice would receive marital assets valued at $522,745 in addition to her interest in Telemachos's rather substantial retirement account.

Janice was awarded one-half of the marital portion of Telemachos's SURS pension, "if, as[,] and when" the pension is received by Telemachos.

The trial court stated it would normally have considered an unequal distribution of the marital property in Janice's favor because Telemachos's contributions as breadwinner were offset by Janice's contributions as homemaker, Telemachos was in a much better position to acquire future assets, and Telemachos had nonmarital property set off to him valued at $446,026 as opposed to $1,054 to Janice. The court chose not to do that in this case because of Telemachos's substantial contribution of nonmarital funds to the marital estate, which were unable to be traced. The court calculated the total value of

the marital property to be $1,141,204 and awarded 50%, $570,602, to each party. Janice's share was reduced by a $47,857 attorney-fee reimbursement. Telemachos's share was increased by that same amount.

To carry out its division, the trial court awarded nine marital accounts, with a value of $136,572, to Janice. The court awarded eight marital accounts, together with a nonmarital account that owed the marriage a $42,252 reimbursement, to Telemachos. The total value of those eight accounts was $1,004,631. Among those eight accounts were a Vanguard Prime Money-Market Fund, which had been opened by Telemachos before the marriage, and a Vanguard 500 Index Fund, which Telemachos had opened five days before the marriage. The Vanguard Prime Money-Market Fund had a current balance of $20,361. The Vanguard 500 Index Fund had a current balance of $527,072. To equalize the property settlement, Telemachos was ordered to pay Janice $386,172.

Telemachos was also assigned seven nonmarital accounts valued at $446,026, plus his nonmarital residence with an equity of $81,680. Janice was assigned as her nonmarital property her Teacher's Retirement System Account, valued at $1,054.

In its order of October 28, 2003, the trial court noted that the parties had allowed their hatred and bitterness for each other to inhibit any analysis or rational thinking. The result was an inability to agree on just about any issue, to litigate every conceivable issue, to take up huge amounts of court time, and to amass a small·fortune in attorney fees and expenses incurred. Between June 13, 1997, and March 20, 1998, the trial court conducted some 15 hearings on temporary custody and visitation issues. Between February 2, 1999, and February 10, 2000, the court conducted another 18 hearings on permanent custody and visitation. Between February 20, 2001, and February 28, 2003, the trial court conducted 20 hearings on the remaining ancillary issues. On September 3, 2002, Telemachos's attorney was granted leave to withdraw, and Telemachos represented himself, *pro se,* from that point in the litigation.

During the proceedings, the trial court awarded interim attorney fees and costs to Janice on six occasions, totaling $135,714. Telemachos initially paid that entire amount, but because the interim awards were considered an advance from the marital estate, Telemachos was given a credit in the final order. Although the court found both parties "share the blame for this war," the court further found that Telemachos unreasonably continued the custody dispute after the court had ruled against him on temporary custody. Accordingly, the court ordered that Telemachos would be individually responsible for Janice's at-

torney fees to the extent of $40,000 and the balance, $95,714, would be divided equally between the parties. As Telemachos had previously paid the $135,714, Janice was ordered to reimburse the marital estate $95,714 (reimburse Telemachos $47,857).

## II. ANALYSIS

### A. SURS Pension

Telemachos argues the trial court erred in awarding Janice a portion of his SURS pension benefits, "if, as[,] and when" those benefits are received. He also argues that if any part of his earnings after dissolution of the marriage were regarded as marital, that would amount to involuntary servitude in violation of the thirteenth amendment (U.S. Const., amend. XIII).

There are at least two alternate procedures for apportioning unmatured pensions upon dissolution. *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236, 241, 675 N.E.2d 1362, 1366 (1997). Under one approach, the trial court, upon dissolution, determines the present value of the pension, determines the marital interest in the pension, and awards the nonpensioner spouse other marital property to compensate for the award of the entire pension to the pensioner spouse. *Wisniewski*, 286 Ill. App. 3d at 241, 675 N.E.2d at 1366-67. Under the second approach, the court does not immediately compensate the nonpensioner spouse. Instead, it orders that the employee spouse pay the nonemployee spouse his or her portion of the marital share "if, as, and when" the pension plan becomes mature. *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979). At the time of dissolution, the court can devise a formula that will later determine both the marital interest and the nonpensioner's share in the benefits. This formula produces a percentage, which will be multiplied by the pension payments as they are actually received. *Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.

Both parties here asked for an immediate offset of the SURS pension. The trial court declined to do so for a number of reasons: (1) Telemachos's retirement date was probably not close; (2) there was a tremendous discrepancy in the opinions of the present value of the pension, Telemachos's expert valuing it at $124,116 and Janice's expert valuing it at $669,498; (3) a "clean break" between the parties was impossible because their three children "will require, unfortunately, substantial involvement between the parties in the future"; and (4) Janice's concerns that Telemachos would leave the country are speculative as Telemachos has appropriately complied with court orders, and in any event, SURS is based in Champaign and could possibly be joined as a third party if emergency circumstances occur. We

conclude the trial court did not abuse its discretion in its choice of an apportionment method. See *Wisniewski*, 286 Ill. App. 3d at 244, 675 N.E.2d at 1368.

■ We disagree with Telemachos's argument that consideration of any part of his earnings after the dissolution is improper. Part of the benefits that Telemachos will accrue after the dissolution will be due to marital contributions, contributions he made during the marriage. The trial court was not required to ignore those marital contributions. *Wisniewski*, 286 Ill. App. 3d at 243-47, 675 N.E.2d at 1368-70.

### B. Classification of Marital and Nonmarital Property

■ Telemachos argues the trial court erred in classifying the Vanguard Prime Money-Market Fund and the Vanguard 500 Index Fund, both of which had been opened by him before the marriage, as marital property. Even if the court erred in its classification, however, we see no error. The court is required to "assign each spouse's non-[ ]marital property to that spouse." 750 ILCS 5/503(d) (West 2002). That was done here. The two funds were awarded to Telemachos. Classification of the accounts as marital arguably resulted in Janice receiving a greater share of the other marital assets. The court is allowed to take nonmarital property into consideration, however, in determining what share of the marital property should be awarded the parties. The court shall divide marital property in just proportions considering all relevant factors, including "the value of the property assigned to each spouse." 750 ILCS 5/503(d)(3) (West 2002). The trial court stated it would have awarded a greater share of the marital assets to Janice but for "the nonmarital property contributed to the marital funds by [Telemachos] which were unable to be traced." The court was well aware of the parties' marital and nonmarital contributions. The court's distribution of marital assets was proper even if its classification of the two accounts was not and there were fewer marital assets than the court had calculated.

However, we conclude the two funds were properly classified as marital. "[P]roperty acquired before the marriage" constitutes non-marital property. 750 ILCS 5/503(a)(6) (West 2002). "Property," however, must have some identity, some integrity. A mere receptacle (a bucket?), owned by a party before the marriage, into which he places marital property, is not sufficient to invoke the rule that "contributing one estate of property into another resulting in a loss of identity of the contributed property" transmutes the classification of the contributed property to that of the estate receiving the contribution. 750 ILCS 5/503(c)(1) (West 2002). "We believe that to hold that those funds were transmuted to nonmarital property would contravene the intent

behind section 503(c) of the [Illinois Marriage and Dissolution of Marriage] Act [(Dissolution Act)] (750 ILCS 5/503(c) (West 1998))." *In re Marriage of Henke*, 313 Ill. App. 3d 159, 168, 728 N.E.2d 1137, 1143 (2000). *Henke* involved a checking account that was in existence prior to the parties' marriage. In holding that the funds in the account were marital, the trial court relied on the facts that the amount of marital funds contributed greatly exceeded the amount of nonmarital funds initially present, and funds were deposited and withdrawn during the marriage and used to pay family expenses. *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1144. *Henke* recognized that the right of reimbursement could be of little value with such an asset after a marriage of 16 years. *Henke*, 313 Ill. App. 3d at 167, 728 N.E.2d at 1143; *cf.* 1 H. Gitlin, Gitlin on Divorce § 8—10(c), at 8—57 n.40 (May 2002) (Second District in *Henke* did not adhere to the statutory prescription of section 503(c)(1)).

We agree with *Henke*. A party should not be allowed to defeat the fundamental concept that all property acquired during the marriage is marital property by opening a checking account in his name and placing a meager amount in that account before the marriage, then depositing all his paychecks into that account after the marriage. We recognize *Henke* did not employ this precise analysis. *Henke* stressed the fact that the parties did not dispute the checking account at issue, in existence prior to the parties' marriage, was initially nonmarital property. *Henke*, 313 Ill. App. 3d at 167, 728 N.E.2d at 1143. Other cases addressing the issue have also assumed that the account itself took on the identity of either a marital or a nonmarital asset based on the type of funds used to initially establish the account. See *In re Marriage of Phillips*, 229 Ill. App. 3d 809, 594 N.E.2d 353 (1992); *In re Marriage of Perlmutter*, 225 Ill. App. 3d 362, 587 N.E.2d 609 (1992). The parties here did dispute whether these accounts were nonmarital property.

When a brokerage account is established during a marriage with nonmarital funds and marital funds are later added to that account, you do not have a situation where one estate of property is contributed "into another resulting in a loss of identity of the contributed property." 750 ILCS 5/503(c)(1) (West 2002). Instead, you have a situation where "marital and non[ ]marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates." 750 ILCS 5/503(c)(1) (West 2002); *In re Marriage of Davis*, 215 Ill. App. 3d 763, 770, 576 N.E.2d 44, 48-49 (1991). There is not a loss of identity by one estate; there is a loss of identity by both estates. In that situation, "the commingled property shall be deemed transmuted to marital property." 750 ILCS 5/503(c)(1) (West 2002).

Unlike, for example, the situation where $100,000 of nonmarital funds are used to purchase a residence and then $100,000 of marital funds are used over the years to maintain the residence, it makes little difference whether $100,000 of marital funds are placed in an account before or after $100,000 of nonmarital funds are placed in that account. The exact same asset has been contributed by each estate, and the result is newly acquired property, not a loss of identity of the contributed property while the receiving property maintains its identity. We do not see it as particularly significant that the brokerage account in *Davis* was opened after the marriage while the accounts here were opened prior (in one case five days prior) to the marriage. We should ignore the receptacle and look to the funds.

The trial court made several findings regarding these accounts. First, it was never clear to the court from the evidence presented exactly what funds were owned by Telemachos immediately prior to the marriage. Second, myriad transfers occurred among the various accounts during the marriage. Third, many of the investments were funded during the marriage by withdrawals from Telemachos's checking account where his University paycheck was deposited. Fourth, evidence showed that during the nine years of the marriage, the parties expended very little of Telemachos's University income. Telemachos's University income over the period of the marriage and the period between the dissolution filing and the entry of the judgment on grounds would certainly account for a substantial amount of the investments.

"A trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence." *Henke,* 313 Ill. App. 3d at 166, 728 N.E.2d at 1143. A court's decision is contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident or where its findings are unreasonable, arbitrary, and not based upon any of the evidence. *Maple v. Gustafson,* 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13 (1992). The trial court carefully considered the voluminous testimony in this case, made detailed findings, and entered a thorough, reasoned order. The trial court's decision was well-supported by the evidence.

At trial, Telemachos offered a multipage document showing his calculations of the growth of marital and nonmarital assets in the various accounts. The trial court excluded the document on the basis it had not been timely disclosed. Even assuming the trial court erred in excluding the document, we are confident Telemachos had a full opportunity to present his theory of the case in these lengthy proceedings.

## C. Reimbursement of the Marital Estate

■ Telemachos argues that the trial court improperly ordered him to reimburse the marital estate $45,252 from his nonmarital Vanguard Windsor individual retirement account (IRA). He argues that Janice failed to retrace any marital contributions "by clear and convincing evidence" and that Janice's expert relied on a compound-interest formula, which was inappropriate for stocks. Telemachos's salary from the University was his only income during the marriage, and any contributions to the account had to come from that source. It is possible that the account could have received transfers from other nonmarital accounts, but Telemachos has not shown that such transfers occurred. Janice's expert, Mary McGrath, a certified public accountant and certified financial planner, testified that stock accounts, such as the Vanguard Windsor IRA, were different from compound-interest-bearing accounts. Stock accounts had no fixed rate of interest and their value depended on the fluctuating value of the shares. McGrath testified that in the case of stocks, she performs her calculations "more on an actual accounting basis, of following the original investment and growth on it." It appears the trial court properly ordered the reimbursement.

## D. Attorney Fees

■ The trial court awarded interim fees and costs to Janice in the amount of $135,714, which the court designated as an advance from the marital estate. See 750 ILCS 5/501(c—1)(2) (West 2002) (interim awards shall be deemed to have been advances from the parties' marital estate). At the conclusion of the case, the trial court ordered that $40,000 of those fees would not be paid from the marital estate but by Telemachos. See 750 ILCS 5/503(j) (West 2002) (petition for contribution to fees and costs after proofs have closed). Telemachos complains that when the trial court ordered him to pay $25,000 in interim fees on July 16, 2002, he had no more marital funds under his control and therefore had to pay the $25,000 out of a nonmarital account. He asks that Janice be ordered to reimburse his nonmarital estate in that amount. Janice was in fact ordered to reimburse Telemachos's nonmarital estate in the amount of $47,857. If it is Telemachos's argument that the trial court did not have the power to order him to pay the $40,000 of Janice's fees in their entirety, we disagree. "If at any time a court finds that a hearing under this [s]ection was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly." 750 ILCS 5/508(b) (West 2002). The court found that Telemachos unreasonably continued the

custody dispute after the court had ruled against him on temporary custody and that the $40,000 in attorney fees was incurred for that reason.

### E. Janice's Cross-Appeal

■ In a cross-appeal, Janice complains that the trial court did not consider the attorney fees and costs paid by Telemachos on his own behalf as an advance from the marital estate. Janice argues that Telemachos paid his own attorney fees in the amount of $184,324 from the marital estate, and only the remaining marital estate was divided equally between the parties. In contrast, the attorney fees paid on Janice's behalf, $95,714, were added back to the marital estate before the estate was divided. Janice raised this issue in a posttrial motion to reconsider. When the motion to reconsider was argued, the trial court complained that Janice never raised that issue, which was somewhat in the nature of a claim that Telemachos had dissipated marital assets by paying his own attorney fees. No evidence showed the source of Telemachos's payments, and the burden of proving dissipation is on the party alleging it. See *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 596, 798 N.E.2d 1223, 1229 (2003). We cannot say that the trial court abused its discretion in denying Janice's posttrial motion. The trial court was satisfied with its division of property even if its division was not precisely 50/50.

### F. Restrictions on Visitation

■ Telemachos argues the trial court erred when it included the following provision in its order awarding custody to Janice and providing for visitation: "[Telemachos] is prohibited from taking the children outside the continental United States during any visitation period. The attorney for [Telemachos] is to continue to hold any passports of the minor children." The Dissolution Act provides that "the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral[,] or emotional health." 750 ILCS 5/607(c) (West 2002). Not every limitation on visitation is a "restriction" within the meaning of section 607(c), however. Section 607(c) is designed to preserve the standard aspects of visitation, not to grant the noncustodian unusual rights. A noncustodian's right to unsupervised visitation, including overnight visitation in his home, is protected by section 607(c), but little beyond that is covered. See *Gibson v. Barton*, 118 Ill. App. 3d 576, 580, 455 N.E.2d 282, 284 (1983).

Telemachos resides in Illinois and has standard visitation with his children. If Telemachos should choose to visit his native country, he may attempt to work out the arrangements with Janice. If an agree-

ment cannot be reached, Telemachos may petition the trial court for permission. The court properly declined to grant Telemachos blanket leave, in advance of any planned trip, to leave the country with the children.

## III. CONCLUSION

We have considered Telemachos's remaining arguments, many of which are not supported by explanation or legal authority. We reject those arguments.

We affirm the trial court's judgment.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE APPLETON, dissenting:

I respectfully dissent from the decision of the majority. While I concur that Janice can, without offending the statute, end up with the same amount awarded to her, the trial court, as affirmed by the majority, took the wrong path to arrive at that result.

In a proceeding for dissolution of marriage, the trial court must first assign each spouse's nonmarital property to that spouse and then divide the marital property into just proportions. 750 ILCS 5/503(d) (West 2002); *Phillips*, 229 Ill. App. 3d at 817, 594 N.E.2d at 358. We do not disturb the classification of property as marital or nonmarital unless it is against the manifest weight of the evidence. "Against the manifest weight of the evidence" means the opposite conclusion is clearly evident from the evidence or the finding is arbitrary, unreasonable, or not based on the evidence. *Farmers Automobile Insurance Ass'n v. Gitelson*, 344 Ill. App. 3d 888, 892, 801 N.E.2d 1064, 1067-68 (2003), *appeal denied*, 207 Ill. 2d 600, 807 N.E.2d 974 (2004). Telemachos argues the classification of his Vanguard Money-Market Reserves Prime Portfolio account (Portfolio account), which we will refer to as account No. 978715072-4, as marital property is against the manifest weight of the evidence. Because the accounts predate the marriage, I agree.

Section 503(a) of the Dissolution Act explains the difference between "marital" and "nonmarital property":

> "(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non[ ]marital property':
>
> ***
>
> (2) property acquired in exchange for property acquired before the marriage ***;

\* \* \*

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non[ ]marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this [s]ection; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." 750 ILCS 5/503(a) (West 2002).

Under section 503, each item of property is either entirely marital or entirely nonmarital, not a hybrid of the two, and that rule holds true despite the commingling of marital and nonmarital property. Section 503(c) provides:

"(c) Commingled marital and non[ ]marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

(1) When marital and non[ ]marital property are commingled by contributing one estate of property into another resulting in a loss of identity of the contributed property, the classification of the contributed property is transmuted to the estate receiving the contribution, subject to the provisions of paragraph (2) of this subsection; provided that if marital and non[ ]marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection.

(2) When one estate of property makes a contribution to another estate of property, or when a spouse contributes personal effort to non[ ]marital property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made with respect to a contribution which is not retraceable by clear and convincing evidence, or was a gift, or, in the case of a contribution of personal effort of a spouse to non[ ] marital property, unless the effort is significant and results in substantial appreciation of the non[ ]marital property. Personal effort of a spouse shall be deemed a contribution by the marital estate. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non[ ]marital property which received the contribution." 750 ILCS 5/503(c)(1), (c)(2) (West 2002).

Thus, under section 503(c)(1), the commingling of marital and

nonmarital property will result in either of two transmutations, depending on the loss of identity. If, in the commingling of the two estates, the contributing estate loses its identity and the receiving estate retains its identity, the contributing estate is transmuted to the receiving estate. If both estates commingle into new property and thereby lose their identities, the new property is marital property.

The parties agree that the Portfolio account existed before the marriage and that, after the marriage, marital assets were commingled with it. (Telemachos argued in trial court that *"most* of the transfers into this account *** [could not] but be nonmarital in nature."* (Emphasis added.)) "[P]roperty acquired before the marriage" is nonmarital. 750 ILCS 5/503(a)(6) (West 2002). The trial court found—and the evidence supports the finding—that, during the marriage, Telemachos used his earnings as a professor to buy additional shares in the Portfolio account. Those earnings were marital property. See 750 ILCS 5/503(a) (West 2002). On the authority of *Davis*, 215 Ill. App. 3d 763, 576 N.E.2d 44, Janice argues the commingling of marital and nonmarital funds in the Portfolio account transmuted the account to marital property.

In *Davis*, 215 Ill. App. 3d at 767, 576 N.E.2d at 47, J. Nathaniel Davis, Jr. (Nat), inherited assets from his mother during his marriage and used the inheritance to open a money-market account with Merrill Lynch. A year later, he inherited assets from his father and deposited that inheritance into the account as well. *Davis*, 215 Ill. App. 3d at 767, 576 N.E.2d at 47. Still later, he sold stock he had bought during the marriage and deposited the proceeds into the same account. *Davis*, 215 Ill. App. 3d at 767-68, 576 N.E.2d at 47. Clearly, the assets from his parents' estates were his nonmarital property (see Ill. Rev. Stat. 1987, ch. 40, pars. 503(a)(1), (a)(2)), and the stock he had bought during the marriage was marital property (see Ill. Rev. Stat. 1987, ch. 40, par. 503(a)). Nat argued he had created the money-market account with nonmarital property and, under section 503(c)(1), any subsequent deposits of marital property into the account were transmuted to his nonmarital property. *Davis*, 215 Ill. App. 3d at 768, 576 N.E.2d at 47.

The First District disagreed with Nat because, according to its reasoning, items of both marital and nonmarital property were commingled into new property, resulting in the third type of transmutation in section 503(c)(1). *Davis*, 215 Ill. App. 3d at 769, 576 N.E.2d at 48. By depositing funds into the money-market account, he had bought shares in the account, and Merrill Lynch in turn had used those shares to buy new stock and bonds. *Davis*, 215 Ill. App. 3d at 769, 576 N.E.2d at 48. Although the shares in the account were initially nonmarital

property, he later began buying more shares with marital property. *Davis*, 215 Ill. App. 3d at 769, 576 N.E.2d at 48. It was impossible "to distinguish which *** shares were used to purchase additional stocks or bonds." *Davis*, 215 Ill. App. 3d at 769, 576 N.E.2d at 48. "Thus, newly created assets came into being. Once marital and nonmarital funds are commingled and lose their identity through acquisition of a newly created asset during the marriage, the asset is marital." *Davis*, 215 Ill. App. 3d at 769, 576 N.E.2d at 48.

*Davis* is, however, irreconcilable with section 503(c). Nat established the Merrill Lynch account with assets he had inherited from his parents. Therefore, the account was his nonmarital property. When he later deposited marital funds into the account, those funds lost their identity. The account, however, retained its identity. It remained the same account; only the number of shares changed. At the instant of their deposit into the account, the marital funds were transmuted to Nat's nonmarital property (subject to reimbursement of the marital estate). See Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(1). When Merrill Lynch in turn used the shares in the account to buy stocks and bonds, it was using Nat's nonmarital property (to which the marital funds had already been transmuted). Only if both contributing estates lost their identity in the acquisition of new property were they transmuted to marital property. See Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(1). That, apparently, was not what happened in *Davis*. Instead, the marital funds were transmuted to nonmarital property upon their deposit into the account, and, after that transmutation, Merrill Lynch used the funds in the account to buy other securities.

As the Second District has repeatedly held, the deposit of marital funds into a nonmarital investment account transmutes those funds to nonmarital property. In *Phillips*, 229 Ill. App. 3d at 812, 594 N.E.2d at 355, for example, Ann Phillips participated in a stock ownership plan through her employment. She began participating in the plan, and accumulating stock therein, before her marriage. *Phillips*, 229 Ill. App. 3d at 812, 594 N.E.2d at 355. After the marriage, she bought additional stock with marital funds. *Phillips*, 229 Ill. App. 3d at 818, 594 N.E.2d at 359. The trial court erroneously classified the stock ownership plan as a marital asset. *Phillips*, 229 Ill. App. 3d at 819, 594 N.E.2d at 358-59. In its decision reversing the judgment, the Second District explained:

> "Under section 503(c)(1) of the [Dissolution] Act, the stock ownership plan is a nonmarital asset that increased after marriage through contributions based on Ann's salary, a marital asset. As such, the entire stock plan, all 137.682 shares, should be classified as nonmarital property subject to reimbursement to the marital

estate for contributions made to the plan during the marriage." *Phillips*, 229 Ill. App. 3d at 819, 594 N.E.2d at 360.

In *Perlmutter*, 225 Ill. App. 3d at 378, 587 N.E.2d at 619, Kathryn Perlmutter's father gave her some stock as a gift. She sold the stock and deposited the proceeds into an investment account. *Perlmutter*, 225 Ill. App. 3d at 378, 587 N.E.2d at 619. According to the Second District, the account was her nonmarital property, and when marital funds were later deposited into it, "the classification of the marital funds was transmuted to Kathryn's nonmarital estate, subject to the reimbursement provisions of section 503(c)(2)." *Perlmutter*, 225 Ill. App. 3d at 379, 587 N.E.2d at 620.

In *In re Marriage of Di Angelo*, 159 Ill. App. 3d 293, 295, 512 N.E.2d 783, 785 (1987), N. Joseph Di Angelo had a profit-sharing account through his employment, and immediately before his marriage, the account had a cash value. After the marriage, he rolled the profit-sharing account into an IRA. *Di Angelo*, 159 Ill. App. 3d at 295, 512 N.E.2d at 785. Because property obtained in exchange for nonmarital property was nonmarital property (Ill. Rev. Stat. 1985, ch. 40, par. 503(a)(2)), the IRA was Joseph's nonmarital property, as the trial court correctly held. *Di Angelo*, 159 Ill. App. 3d at 295-96, 512 N.E.2d at 785. During the marriage, the IRA increased in value, and, as the court also correctly held, that increase in value was Joseph's nonmarital property under section 503(a)(7) (Ill. Rev. Stat. 1985, ch. 40, par. 503(a)(7))—regardless of whether the source of the increase was marital or nonmarital. *Di Angelo*, 159 Ill. App. 3d at 296, 512 N.E.2d at 785. But the court erred in stopping there. As the Second District explained:

> "The problem lies in the court's failure to make findings regarding the source of the increase in the value of the *** IRA ***. This is a problem because, while the increase in value is [Joseph's] nonmarital property irrespective of its source, it is 'subject to the right of reimbursement provided in' section 503(c) of the [Act] (Ill. Rev. Stat. 1985, ch. 40, par. 503(c)(2)) ***." *Di Angelo*, 159 Ill. App. 3d at 296-97, 512 N.E.2d at 786.

In the present case, rather than follow *Phillips*, *Perlmutter*, and *Di Angelo*, the trial court and the majority rely on another Second District case, *Henke*, 313 Ill. App. 3d 159, 728 N.E.2d 1137, to hold that the Portfolio account was marital property. In *Henke*, 313 Ill. App. 3d at 163, 728 N.E.2d at 1140, Marvin W. Henke, Jr., a farmer, had a checking account in his name, and the account existed before his marriage to Adele. Marvin testified that during the marriage, he deposited his farm earnings into the checking account, from which he paid family expenses and business expenses. *Henke*, 313 Ill. App. 3d at

164, 728 N.E.2d at 1141. Those earnings were marital property. *Henke*, 313 Ill. App. 3d at 167-68, 728 N.E.2d at 1143.

The Second District conceded that "under a *strict* application of section 503(c)(1) of the [Dissolution] Act," the contribution of marital earnings to the nonmarital checking account would have caused those earnings to lose their identity as marital property and become transmuted *to* Marvin's nonmarital property. (Emphasis added.) *Henke*, 313 Ill. App. 3d at 167, 728 N.E.2d at 1143. Section 503(c)(2) would have allowed reimbursement to Adele only insomuch as she retraced each such contribution, by clear and convincing evidence, to a marital source. *Henke*, 313 Ill. App. 3d at 167, 728 N.E.2d at 1143. Considering that the parties had been married for 16 years, retracing the deposits of marital funds into the checking account would have been, as practical matter, impossible for Adele. *Henke*, 313 Ill. App. 3d at 167, 728 N.E.2d at 1143.

In the Second District's view, the legislature could not have intended section 503(c) to apply to such a situation. *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1143. The legislature had amended section 503(c) in 1983 in response to *In re Marriage of Smith*, 86 Ill. 2d 518, 427 N.E.2d 1239 (1981). *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1143. In *Smith*, the supreme court had held that a nonmarital apartment building worth $45,000 had been transmuted to marital property because of a relatively small contribution of $3,800 in marital funds to renovate the building. *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1143-44. The Second District reasoned in *Henke*:

> "The instant case presents the opposite situation of that sought to be ameliorated by the amendment to section 503(c) of the [Dissolution] Act, where a small amount of marital property was contributed to a large amount of nonmarital property. *** Presumably, the amount of marital funds contributed over 16 years greatly exceeded the amount of nonmarital funds initially present in the account." *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1144.

Thus, "under the unique circumstances of [the] case," the Second District classified Marvin's checking account as marital property. *Henke*, 313 Ill. App. 3d at 168, 728 N.E.2d at 1144.

On the authority of *Henke*, the trial court in this case held that the Portfolio account was likewise marital property:

> "As in *Henke*, a large amount of marital funds or presumably marital funds[,] over a period of 14 years[,] was contributed to an account that had just $26,059.68 at the time of the marriage and that[,] by the time the parties separated[,] had $755,865.68. The [c]ourt does not find that [r]espondent has proven his exact nonmarital contribution to that account by clear and convincing evidence."

In applying *Henke* to the Portfolio account, the trial court seems to have overlooked the paragraph of *Henke* in which the Second District expressly distinguished *Phillips* and *Perlmutter*. The Second District said: "It does not appear in either [*Phillips* or *Perlmutter*] that funds were ever withdrawn from the nonmarital accounts or that funds from the nonmarital accounts were ever used to pay family and household expenses." *Henke*, 313 Ill. App. 3d at 168-69, 728 N.E.2d at 1144.

The present case is distinguishable from *Henke* for similar reasons. In exhibit No. 106, Janice purports to describe the "[m]ovement of monies [in the Portfolio account] during the marriage, other than income reinvested." According to this exhibit, during the period of June 30, 1987, through April 3, 1997, Telemachos bought shares in the Portfolio account a total of 59 times, and he exchanged shares for other shares 8 times. The exhibit shows only one "check redemption" for that entire nearly 10-year period: it was on May 11, 1998, in the amount of $31,000. We learn from exhibit Nos. 72 and 83 that the purpose of this solitary "check redemption" was not (as in *Henke*) to pay family or household expenses but, rather, to buy shares in a different investment account, the Vanguard Index Trust 500 account (Index 500 account). Statements from the Vanguard Group of Investment Companies (Vanguard) show the transaction.

Thus, according to the undisputed evidence, this case lacks the "unique circumstances" of *Henke*. The Portfolio account was not a checking account from which the parties routinely (or, it appears, ever) paid household expenses. This case is closer to *Phillips*, *Perlmutter*, and *Di Angelo* than to *Henke*.

Not only is *Henke* distinguishable, but I respectfully disagree with that decision because, like *Davis*, it is irreconcilable with the plain, unambiguous language of section 503(c)(1). Gitlin observes:

> "While the *Henke* opinion states the appellate court is not making a 'strict' application of [section] 503(c)(1), the fact is that [section] 503(c)(1) simply was not applied by the appellate court. While classifying the checking account funds as marital appears to be equitable, the [S]econd *** [D]istrict did not adhere to the statutory prescription of [section] 503(c)(1)." 1 H. Gitlin, Gitlin on Divorce § 8—10(c), at 8—57 n.40 (May 2002).

We have a duty to apply the clear provisions of section 503(c)(1) without reading into the statute any exceptions or limitations— regardless of whether we think the statute is a bad idea in a given case. See *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92, 114, 787 N.E.2d 771, 783 (2003). Nowhere does the statute say it is inapplicable to accounts used to pay household expenses. Nowhere does the statute

say it is inapplicable to nonmarital accounts that began with a low balance and grew during the marriage because of marital contributions.

The contributions of marital funds had no effect on the identity of the Portfolio account. The marital deposits lost their identity, but the Portfolio account remained the same account—with the same account number, the same investment company, the same shareowner, and the same contractual terms. The number of shares changed, but not the essential identity of the account. The Portfolio account is Telemachos's nonmarital property, subject to reimbursement to the marital estate for contributions that are retraceable by clear and convincing evidence, including Telemachos's earned income. See 750 ILCS 5/503(a)(7), (c) (West 2002). The crystal-clear language of sections 503(a)(6) and (c)(1) admits of no other conclusion. The classification of this account as marital property is against the manifest weight of the evidence.

Also in reliance on *Henke*, the trial court classified the Index 500 account, which we will refer to as account No. 984196452-6, as marital property. The court found that Telemachos opened this account on June 15, 1987—five days before the marriage. *Ergo*, it is Telemachos's nonmarital property (see 750 ILCS 5/503(a)(6) (West 2002)), subject to reimbursement of the marital estate (see 750 ILCS 5/503(c) (West 2002)). Its classification as marital property is against the manifest weight of the evidence.

Telemachos also argues that the trial court erroneously classified his Vanguard Money-Market Reserves Prime Portfolio IRA (Portfolio IRA) as marital property. He contends that he opened this account on December 29, 1994, with $2,000 from a nonmarital account, the Portfolio account. Exhibit No. 83, pertaining to the Portfolio account, contains an account statement showing a transfer on December 29, 1994, of $2,000 from the Portfolio account to an account which we will refer to as No. 9784700300, which is the account number of the Portfolio IRA. The first statement in exhibit No. 6, pertaining to the Portfolio IRA, shows a "beginning balance" of $2,000 on the "trade date" of December 29, 1994. Property acquired during the marriage is presumed to be marital property, but one can rebut that presumption by showing the property was acquired by a method listed in section 503(a) of the Dissolution Act (750 ILCS 5/503(a) (West 2002)). 750 ILCS 5/503(b)(1) (West 2002). The account statements from Vanguard, in exhibit Nos. 6 and 83, prove that the Portfolio IRA is "property acquired in exchange for property acquired before the marriage." See 750 ILCS 5/503(a)(2) (West 2002). Therefore, Telemachos rebutted the presumption that the Portfolio IRA was marital property, and it should have been classified as nonmarital property.

In short, the trial court should have reimbursed the marital estate for these three accounts to the extent that Janice retraced the marital contributions by clear and convincing evidence, and then the court would have been free to divide the marital estate in "just" proportions to arrive at the same or similar total asset allocation between the parties. The use of *Henke* in circumstances that do not match the special ones presented by the facts of that case is simply a shortcut to avoid the analysis required by the statute.