# Illinois Official Reports

## Appellate Court

*In re Marriage of Veile*, 2015 IL App (5th) 130499

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF CHERYL A. VEILE, Petitioner-Appellant, and ROGER D. VEILE, Respondent-Appellee. |
| District & No. | Fifth District<br>Docket No. 5-13-0499 |
| Filed | November 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 10-D-852; the Hon. Randall W. Kelley, Judge, presiding. |
| Judgment | Affirmed in part; reversed and remanded in part. |
| Counsel on Appeal | Rhonda D. Fiss and Michael A. Aguirre, both of Law Office of Rhonda D. Fiss, P.C., of Belleville, for appellant.<br><br>Robert E. Wells, Jr., of Pessin, Baird & Wells, of Belleville, for appellee. |

PRESIDING JUSTICE CATES delivered the judgment of the court, with opinion.
Justice Chapman concurred in the judgment and opinion.
Justice Moore[*] dissented, with opinion.

**OPINION**

¶ 1        Petitioner-appellant, Cheryl A. Veile (Cheryl), appeals from the supplemental judgment entered by the circuit court of St. Clair County on the original judgment of dissolution of her marriage to respondent-appellee, Roger D. Veile (Roger). We affirm in part and reverse and remand in part.

¶ 2        Cheryl and Roger were married in 1984. During their marriage, Cheryl worked outside the home for two years and then began working for Veile Construction Co., Inc., the family business owned by Roger's parents. In 1992, when their daughter was born, Cheryl became a full-time homemaker and mother and did not return to the work force until 2008. Now 57, with a high school education, Cheryl continues to be employed, and at the time of the order was working full time in the housekeeping department at Memorial Hospital, earning approximately $740 every two weeks.

¶ 3        Roger, also 57 years of age, is a civil engineer. He is self-employed by Veile Engineering, a closely held corporation. For the majority of the marriage, Roger worked, through Veile Engineering, for Veile Construction Co., the family business owned by his parents. In 1990 and 1991, Roger received, as gifts from his parents, 43 shares of Veile Construction Co. stock. These gifts gave Roger a 33.08% share of ownership in the company. As part of its business, Veile Construction Co. owned, managed, and operated a mobile home park, Arapaho Village Mobile Home Park. Roger managed the mobile home park as part of his duties working for Veile Construction Co. In 1993, Veile Construction Co. was renamed Arapaho Village, Inc.

¶ 4        In June of 2006, the mobile home park was sold for approximately $4 million. The proceeds of the sale were transferred to two Fidelity accounts in the name of Arapaho Village, Inc. Roger then became the money manager for the funds, and his compensation from Arapaho Village, Inc., was reduced to a fraction of his former pay. In 2005, he was paid $48,000 for his management services to Arapaho Village. In 2010, Roger laid himself off from Veile Engineering and collected unemployment benefits off and on for the next two years. As of 2011 and 2012, Arapaho Village was paying Roger, through Veile Engineering, only $3,000 to $6,000 per year for managing the Fidelity accounts. For the 2011 tax year, Veile Engineering received a total of $18,500 in income. Accordingly, based upon his financial statements, the average of Roger's earning for the last three years was $1,359 per month. His adjusted gross income for 2011, according to his tax return, was $40,869, after deduction of self-employed

_____

[*]Justice Spomer was originally assigned to participate in this case. Justice Moore was substituted on the panel subsequent to Justice Spomer's retirement and has read the briefs and listened to the tape of oral argument.

health insurance and maintenance. More than half of his income was derived from assets in the form of dividends, claimed by Roger to be nonmarital.

¶ 5    While the earnings for Veile Engineering were minimal for a civil engineering company, the parties lived a rather lavish lifestyle funded primarily by corporate distributions Roger received based upon his gifted shares in Arapaho Village. Roger and Cheryl had virtually no debt, vacationed regularly in Florida, owned a $260,000 home, joined exclusive clubs, had a $65,000 boat, owned their vehicles outright, and bought clothing and personal items whenever they wanted.

¶ 6    Throughout the marriage, Roger would withdraw retained earnings in the Arapaho Village account and place them in other accounts, including his own Fidelity investment account, as well as the parties' joint account. Over the years, he transferred some $90,000 to the parties' joint account to fund the marriage and their lifestyle, plus any monies needed to pay the taxes and expenses owed as a result of the distributions. In 1996, Arapaho Village became an S corporation. As a result, the taxes owed for Arapaho Village flowed through the company to the stockholders. In order to pay the taxes owed for the corporation, Roger received money from Arapaho Village, placed it into his joint account with Cheryl, and paid the taxes due.

¶ 7    From 1998 until 2011, Cheryl was an officer of Arapaho Village and was authorized to trade within the company's Fidelity investment accounts. A few months prior to the dissolution, however, Cheryl's name was removed from the Arapaho Village accounts. Cheryl was unaware that she had been removed from the Arapaho Village accounts. At the time of trial, Roger's portion of the Fidelity accounts was worth $768,359. Roger's personal investment account had a value of approximately $472,670.

¶ 8    As a part of the dissolution, the parties sold their marital home. Cheryl moved in with her parents and took care of them in exchange for housing. Roger also moved in with his parents. The parties' daughter, who was still in college, chose not to live with either Cheryl or Roger. Roger was paying her college tuition, but Cheryl was paying the majority of her other expenses, including medical bills and insurance.

¶ 9    The judgment of dissolution of the parties' marriage was entered on June 13, 2012. In the supplemental judgment of dissolution, entered on April 9, 2013, the trial court classified the 43 shares of Veile Construction Co., n/k/a Arapaho Village, Inc., gifted to Roger by his parents, as Roger's nonmarital property. The court further concluded that the investment accounts Roger established in his name alone, which were funded by distributions from Arapaho Village, were also his nonmarital property. The court then awarded Cheryl 55.19% of the parties' marital assets, including the remaining balance from the sale of the marital residence, leaving Roger with 44.81% of the marital assets. The parties' daughter was awarded several accounts already established in her name, as well as the vehicle she was then driving. The court further determined, given that neither party was earning a significant income, that Cheryl would receive maintenance in the amount of $650 per month until Roger turned 66 or elected to take Social Security. The court did not classify the maintenance as rehabilitative, but stated that Cheryl was under an obligation to use her own good-faith efforts to maximize her self-sufficiency. The court also concluded that each party was responsible for their own attorney fees and costs, and further denied Cheryl's request for sanctions for alleged discovery violations.

¶ 10    Cheryl first argues on appeal that Roger's portion of the retained earnings of Arapaho Village, including distributions from the two Fidelity accounts, were attributable to his

personal efforts in managing, building, and eventually selling the mobile home park, and should therefore be categorized as marital property. She also contends the court abused its discretion in awarding her only $650 a month in maintenance, which could terminate as early as Roger reached the age of 62. She further argues that the denial of her motion for sanctions constituted an abuse of discretion, as did the court's denial of her request for postmajority educational support for the parties' daughter.

¶ 11    We turn first to the issue pertaining to Arapaho Village, Inc., and the two Fidelity accounts in the name of Arapaho Village, Inc. Cheryl argues that Roger's portion of the retained earnings of Arapaho Village, including distributions from the two Fidelity accounts, were attributable to Roger's personal efforts in managing, building, and selling the mobile home park. Cheryl therefore believes these accounts, as well as any retained earnings, should be categorized as marital property. We disagree.

¶ 12    We initially note that the trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 356, 831 N.E.2d 1222, 1228 (2005). While marital property generally includes "all property acquired by either spouse subsequent to the marriage" (750 ILCS 5/503(a) (West 2012)), nonmarital property includes income derived from a gift, provided that the income is not attributable to the personal efforts of a spouse (see 750 ILCS 5/503(a) (West 2012)). Cheryl believes the exception applies in this instance. Cheryl also points out that placement of nonmarital property in joint tenancy or some form of co-ownership raises the presumption that a gift was made to the marital estate, and this presumption of gift transforming the property into marital property may be rebutted only by clear and convincing evidence that no gift was intended. See *In re Marriage of Benz*, 165 Ill. App. 3d 273, 280, 518 N.E.2d 1316, 1319 (1988). Because she was designated as co-owner of the two Fidelity accounts, and remained as co-owner of the accounts until Roger removed her name a few months before the dissolution hearing, Cheryl contends the accounts were gifted to the marital estate and transformed into marital property. She also points out in support of her position that Roger ran distributions from the Fidelity accounts through their joint checking account.

¶ 13    It is true that Roger did transfer distribution monies to the parties' joint account and Cheryl's name was listed on the Fidelity accounts. Contrary to Cheryl's arguments, however, this does not mean the accounts were transmuted into marital property. The evidence presented at the dissolution hearing clearly established that Roger was gifted stock in an existing asset which was fully developed at the time of the parties' marriage. Roger did little during the marriage to expand, increase, modify, or improve the mobile home park, which existed prior to the marriage. Moreover, Roger, as well as Cheryl, was fully compensated by Veile Construction and Arapaho Village for any work they performed. We note that maintenance of an asset is not enough to convert that asset into marital property. See *In re Marriage of Frazier*, 125 Ill. App. 3d 473, 478, 466 N.E.2d 290, 294 (1984). More importantly, after the mobile home park was sold, all of the proceeds were deposited into two Fidelity accounts, which were opened in the name of Arapaho Village, Inc. The assets deposited in the Fidelity accounts were the corporate assets of Arapaho Village, Inc. The tax identification number for each account was the tax identification of Arapaho Village, Inc., not the social security numbers of either Roger or Cheryl. The 1099s issued by Fidelity for the accounts were in the name of Arapaho Village and were included in Arapaho Village's corporate tax return. There was absolutely no

evidence in any of the numerous documents submitted that any marital funds were ever deposited in the Fidelity accounts. As the trial court recognized, a corporation is a separate entity. Officers of a corporation are not permitted to appropriate corporate assets to themselves. Roger and Veile Engineering were fully compensated for services provided by Roger to Arapaho Village, and the marital estate was reimbursed for any taxes resulting from Arapaho Village being an S corporation. While the parties benefitted from the infusion of nonmarital cash distributions from Arapaho Village during the marriage, that does not mean that such distributions, or Arapaho Village, Inc., or its retained earnings in the Fidelity accounts, were transmuted into marital property. See *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 874 N.E.2d 916 (2007). See also *In re Marriage of Steel*, 2011 IL App (2d) 080974, 977 N.E.2d 761. The same is true for the monies Roger received as his share of the distributions from Arapaho Village, which he placed into his own accounts. Under the circumstances, we find no abuse of the court's discretion in classifying Roger's portion of the retained earnings and distributions from Arapaho Village as nonmarital property.

¶ 14    Cheryl next finds fault with the court's award of maintenance. We agree with Cheryl that the court abused its discretion in awarding her $650 a month with a possible termination date in as early as five years. This was a 28-year marriage. Cheryl is 57 years of age and has only limited work potential. She was a homemaker for most of the marriage and has only a high school education. Roger, on the other hand, is a civil engineer. While he claims to have been having difficulty finding employment since the mobile home park was sold, Roger, unlike Cheryl, has more than $1.2 million in assets upon which he can rely. Cheryl was awarded some $200,000 in marital assets, but she now has to live with her parents and is liquidating assets in order to survive. When one spouse is unable to support herself in the manner in which the parties lived during marriage, then it is an abuse of discretion to award only rehabilitative maintenance. *In re Marriage of Keip*, 332 Ill. App. 3d 876, 883-84, 773 N.E.2d 1227, 1233 (2002). While the court did not classify the maintenance awarded as rehabilitative *per se*, Cheryl was to continue under an obligation to use her own efforts to maximize her self-sufficiency. The court should have equally admonished Roger of his responsibility to find work in light of his education. Moreover, the maintenance award had four possible termination options, one of which would have provided Cheryl with only five years of maintenance. We find the court's use of the various life events that would have terminated Cheryl's maintenance to be disturbing, when clearly Cheryl should have been awarded permanent maintenance. We are also troubled by the monthly amount awarded by the court. Despite the court's statement that it took into account all of the pertinent factors required under section 504 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504 (West 2012)), including Roger's nonmarital assets, in fashioning the award, the amount awarded does not appear to reflect a realistic consideration of such factors. The reasonable needs of a party seeking maintenance are to be measured by the standard of living the parties enjoyed during marriage. *In re Marriage of Simmons*, 87 Ill. App. 3d 651, 659, 409 N.E.2d 321, 327 (1980). Here, the parties were used to living a fairly lavish, debt-free lifestyle. We agree with Roger that the amount requested by Cheryl, which exceeded both his earned income and adjusted gross income, was unrealistic. But clearly, Cheryl was entitled to more than the amount awarded. While Cheryl has no claim to Roger's nonmarital property, the value of the property assigned to Roger, as well as the income it generates, is significant. We therefore conclude that because of the limitations on Cheryl's ability to earn and her lack of financial resources, as compared to

Roger, she should have been awarded permanent maintenance in an amount sufficient for her to attempt to maintain the lifestyle to which she and Roger were accustomed during their marriage. See *In re Marriage of Keip*, 332 Ill. App. 3d at 883-84, 773 N.E.2d at 1233. We therefore must remand this cause for a recalculation of a just award of permanent maintenance.

¶ 15    We likewise remand this cause so that the trial court can award and determine an appropriate amount of postmajority support for the parties' daughter. The court did award the daughter her college fund accounts, but did not make any provisions for her expenses once these accounts were exhausted. Moreover, while Roger is currently paying the daughter's tuition, there is no guarantee that he will continue to do so. Additionally, there are other costs besides tuition and books that should be factored in, such as housing and insurance. We agree with Cheryl that the court failed to consider the vast discrepancy in the parties' incomes and assets in denying postmajority educational support. We understand Roger's position with respect to the daughter's housing choice in refusing to live with either parent, but this does not mean that she should be cut off from other support, such as medical insurance. We therefore remand this portion, as well, for the court to fashion a postmajority award of educational support for the parties' daughter as defined in section 513 of the Act (750 ILCS 5/513 (West 2012)).

¶ 16    The final issue on appeal pertains to the denial of Cheryl's motions for sanctions against Roger for discovery abuse. Whether a party violated a discovery rule is an issue of law that is reviewed *de novo*. *Dalan/Jupiter, Inc. v. Draper & Kramer, Inc.*, 372 Ill. App. 3d 362, 369-70, 865 N.E.2d 442, 450 (2007). The imposition of sanctions for the violation of a discovery rule falls within the discretion of the circuit court. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 620-21, 872 N.E.2d 431, 434 (2007).

¶ 17    Cheryl sent her interrogatories and initial request to produce to Roger in January of 2011. According to Cheryl, Roger did not respond timely to her request to produce. Roger's initial response was in March of 2011, followed by supplemental responses in April and May. The vast majority of the documents were produced, however, just a few days before the initial trial setting. We agree with Cheryl that this type of last-minute dumping is unfair to the litigant. Cheryl's counsel was forced to request a continuance of the trial date. Subsequently, the trial date was continued several times because Cheryl's counsel had difficulty obtaining the additional documents she requested and needed additional time to review the documents once they were finally produced. Roger's production of documents was continuously piecemeal, a form of gamesmanship that should not be countenanced by the court. Four days before the December 2011 setting, Roger produced another 500 pages of documents, which included minutes from a special meeting of the Arapaho Village board of directors authorizing Cheryl to conduct trades within the Fidelity accounts. It was not until after the final hearing that Cheryl finally received documentation that named her as "co-owner" of the Fidelity accounts. Cheryl claims that she incurred substantial attorney fees in attempting to obtain documents that would explain why her name was included on the Fidelity accounts. We agree. This type of piecemeal discovery is contrary to the orderly discovery contemplated by the Illinois Supreme Court Rules.

¶ 18    While discovery was not handled well by any of the parties in this instance, Roger never disputed, denied, or concealed that Cheryl had authorized access, through December 2011, to the Fidelity accounts. What he did dispute is that Cheryl had any individual ownership in the corporate accounts of Arapaho Village. Cheryl spent large sums of money trying to prove

some sort of ownership interest in a corporation that was plainly not marital property. Merely because her name was listed on corporate documents with the ability to trade did not make her part owner of the corporation. She owned no shares, and Roger's shares were declared to be his separate property prior to Cheryl's notice to produce the originating paperwork for the Fidelity accounts. Under the circumstances, the documents Cheryl ultimately received did nothing to advance her marital interest claims. The trial court denied Cheryl's motion for sanctions because her search for documents revealed that she had no interest in the Fidelity accounts. Nevertheless, we are concerned that Roger's counsel engaged in the kind of activity whereby counsel parceled out papers, instead of giving all of the relevant documents to Cheryl's counsel in a timely manner. This activity is contrary to the language and spirit of our supreme court rules that guide discovery. Despite our concerns regarding the handling of these discovery matters, the imposition of sanctions for the violation of a discovery rule falls within the discretion of the circuit court. *Nedzvekas*, 374 Ill. App. 3d at 620-21, 872 N.E.2d at 434. Therefore, we cannot say the trial court abused its discretion in this instance by denying sanctions. Accordingly, we affirm the court's order which denied any sanctions and made each party responsible for their own fees and costs.

¶ 19 For the aforementioned reasons, we affirm the judgment of dissolution of marriage, the court's classification of marital and nonmarital property, as well as the denial of sanctions for alleged discovery violations. We reverse and remand, however, the issues pertaining to the lack of permanent maintenance and the amount to be awarded to Cheryl, and to the lack of postmajority secondary education support for the parties' daughter.

¶ 20 Affirmed in part; reversed and remanded in part.

¶ 21 JUSTICE MOORE, dissenting.

¶ 22 I respectfully dissent and would affirm the entirety of the trial court's judgment. Regarding the issue of maintenance, I emphasize the standard of review. "A maintenance award is within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court abused its discretion." *In re Marriage of Schiltz*, 358 Ill. App. 3d 1079, 1084, 833 N.E.2d 412, 415 (2005). "An abuse of discretion occurs where *no reasonable [person] would take the view adopted by the trial court.*" (Emphasis added.) *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 973, 677 N.E.2d 463, 467 (1997). Moreover, "[i]t is axiomatic that a reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact." (Internal quotation marks omitted.) *People v. Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 509, 841 N.E.2d 928, 945 (2005). "A reviewing court may not overturn a judgment merely because the reviewing court might disagree with the judgment, or, had the reviewing court been the trier of fact, might have come to a different conclusion." *Id*. at 510, 841 N.E.2d at 945. "Further, in a nonjury case, the judgment of the trial court will be upheld if there is *any* evidence to support it." (Emphasis added.) *Brencick v. Spencer*, 188 Ill. App. 3d 217, 219, 544 N.E.2d 91, 93 (1989).

¶ 23 Section 504 of the Act governs maintenance awards. 750 ILCS 5/504 (West 2012). Pursuant to this section "the court *may* grant a temporary or permanent maintenance award *** in amounts and for periods of time as the court deems just." (Emphasis added.) 750 ILCS 5/504(a) (West 2012). Accordingly, maintenance awards are not mandatory, but discretionary. The relevant factors to consider when awarding maintenance are also enumerated in section

504. See *id*. No one statutory factor is dispositive in a maintenance determination. *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 157, 621 N.E.2d 929, 934 (1993).

¶ 24    In this case, the majority emphasizes that Roger's nonmarital property, as well as the income it generates, "is significant." *Supra ¶* 14. Section 504(a)(1) of the Act provides that, when considering a maintenance award, the trial court should consider "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance." 750 ILCS 5/504(a)(1) (West 2012). Moreover, "[i]n awarding maintenance, the trial court has wide latitude to consider the needs of the parties and is not limited to the factors enumerated in section 504." *In re Marriage of Schiltz*, 358 Ill. App. 3d 1079, 1084, 833 N.E.2d 412, 415 (2005). Here, the trial court did in fact take into consideration Roger's nonmarital property before making its determination regarding maintenance, thereby showing a careful exercise of discretion and lending credence to the decision.

¶ 25    The majority stresses that the needs of the party seeking maintenance are to be measured by the standard of living the parties enjoyed during the marriage, and states that Cheryl "now has to live with her parents and is liquidating assets in order to survive." *Supra ¶* 14. However, as also noted by the majority, Roger is now also living with his parents, the parties had virtually no marital debt, both are 57 years old, both will be eligible for Social Security in five years, and Cheryl was awarded more than half of the marital assets, which were quite substantial. Moreover, "[b]ecause, in reality, two households are more costly than one, most parties are not able to afford the same standard of living they enjoyed when living together." *In re Marriage of Keip*, 332 Ill. App. 3d 876, 880, 773 N.E.2d 1227, 1230 (2002). The trial court was careful to point out in the supplemental judgment that the standard of living established during the marriage was the reason it considered Roger's nonmarital property and the income it generates in determining an appropriate maintenance award, despite the fact that Cheryl has no claim to the nonmarital property. When considering all of these principles in light of the evidence presented, I do not find that no reasonable person would have taken the view adopted by the trial court (*In re Marriage of Carpenter*, 286 Ill. App. 3d at 973, 677 N.E.2d at 467) and I find evidence to support the maintenance award (*Brencick*, 188 Ill. App. 3d at 219, 544 N.E.2d at 93). Accordingly, the decision regarding maintenance was not an abuse of discretion and I would affirm the decision.

¶ 26    Like maintenance, the standard of review of the trial court's judgment regarding an award of educational support for a nonminor child is abuse of discretion. *In re Marriage of Thurmond*, 306 Ill. App. 3d 828, 834, 715 N.E.2d 814, 818 (1999). Section 513 of the Act provides that "[t]he court *may* award sums of money *** for the support of the child *** of the parties who [has] attained majority." (Emphasis added.) 750 ILCS 5/513(a) (West 2012). "This section does not mandate that divorced parents must in all cases provide their children with funds for post-high-school education." *In re Support of Pearson*, 111 Ill. 2d 545, 551, 490 N.E.2d 1274, 1277 (1986). Because the Act "states that the court 'may' order a party to provide resources for a child's education, *** this language makes it plain that the legislature intended that the matter be addressed to the trial court's discretion." *Id*. In exercising such discretion, section 513 provides that funds may be awarded, "*as equity may require*," for "educational expenses [that] *may* include *** room, board, dues, tuition, transportation, books, fees, registration and application costs, medical expenses including medical insurance, dental expenses, and living expenses during the school year." (Emphases added.) 750 ILCS

5/513(a)(2) (West 2012). If the court determines that such an award is merited, it shall consider the following factors: "(1) [t]he financial resources of both parents[;] (2) [t]he standard of living the child would have enjoyed had the marriage not been dissolved[;] (3) [t]he financial resources of the child[;] [and] (4) [t]he child's academic performance." 750 ILCS 5/513(b) (West 2012).

¶ 27 In this case, the evidence shows that Roger is willingly paying for Tiffany's tuition and books. Moreover, Roger testified that he provides Tiffany's health insurance, provides her custodial account for educational expenses, and gives cash to her. The trial court awarded Tiffany several accounts already established in her name, as well as the vehicle she was driving. The majority expresses concern that the trial court did not make provisions for Tiffany once the college accounts were exhausted, and that other costs should be factored in such as housing and insurance. The record reflects that Tiffany has voluntarily made decisions that have resulted in an increase in educational expenses. In particular, she was offered free housing with her grandparents, but she turned that down and opted instead to rent an apartment and cohabit with her boyfriend. Tiffany did not testify at the trial. It is obvious that Tiffany is by no means being left to fend for herself financially while pursuing her college education. In light of the facts and in the absence of evidence to the contrary, I do not find that no reasonable person would take the view adopted by the trial court (*In re Marriage of Carpenter*, 286 Ill. App. 3d at 973, 677 N.E.2d at 467) and I find evidence to support the decision of the trial court (*Brencick*, 188 Ill. App. 3d at 219, 544 N.E.2d at 93). Accordingly, I do not find that the trial court's awards to Tiffany for her educational support were an abuse of discretion.

¶ 28 For the foregoing reasons, I would affirm the entirety of the circuit court's judgment.