*In re* MARRIAGE OF LILLIAN CARLYENE ZWEIG, Petitioner-Appellant, and HENRY EUGENE ZWEIG, SR., Respondent-Appellee.

Fifth District   No. 5—02—0743

Opinion filed October 17, 2003.

John Long, of Troy, for appellant.

Frederick M. Steiger, of Edwardsville, for appellee.

JUSTICE KUEHN delivered the opinion of the court:
Lillian Carlyene Zweig appeals from the trial court's orders of

January 10, 2002, and November 1, 2002, which distributed the marital property and denied a motion to reconsider that distribution. We affirm.

Lillian Carlyene Zweig (Carlyene) and Henry Eugene Zweig, Sr. (Gene), took their marital vows on July 21, 1954. They had four children during the marriage, three of whom still survive.

Carlyene was a homemaker until their youngest child was three. At that time she entered the workforce—in about 1964. She worked in an accounting department and later as a bank teller. She worked until sometime shortly after August 1991.

Gene began work as a truck driver for Missouri Pacific Truck Lines at the end of January 1968. On August 2, 1991, when he was loading a piggyback trailer on a railroad car, a stanchion fell, causing Gene to fall. The fall resulted in a fracture of Gene's neck at the C5-6 level and rendered him a quadriplegic. He remained hospitalized for five months. During this time, Carlyene quit her bank job in order to be able to take care of her husband.

Immediately after Gene's injury, Carlyene obtained a power of attorney so that she could access and assert control over investment accounts held solely in Gene's name. For reasons not entirely clear from the record, Carlyene took it upon herself in November 1993 to try to secure control over Gene's estate through a court process in which she sought to have him declared incompetent. This attempt was unsuccessful. Gene filed a request for an order of protection, which was granted. The order of protection prevented Carlyene from interfering with his personal liberty and controlling his person and assets. At the trial of this case, Carlyene denied ever having filed such an action, but she was impeached with the documentary proof.

Four years later, Gene finally was paid for his personal injury claims, in the amount of $1,744,843.15.

Gene testified that before he received his settlement, as a result of his various disability payments, his stream of monthly income was $4,120. The sources of this amount were benefits from workers' compensation, social security disability, employment pension, and Veterans' Administration disability. What we do not know is how long it took after his accident to reach this level of income and whether he went without income for a period of time immediately following his accident.

After Carlyene obtained control of Gene's investment assets, she liquidated them, transferred the money into accounts bearing only her name, and then ultimately purchased treasury bills. Interest on these treasury bills was credited to Carlyene's account. She did not discuss any of these financial matters with Gene, who had no idea that his

investment accounts had been liquidated. The monetary total of the investment accounts prior to their liquidation was $235,496. Additionally, Carlyene liquidated her own 401(k) account, which contained $23,945. For the five years following this liquidation, Carlyene received interest payments totaling $13,000 annually. When Gene requested financial information during this time, Carlyene informed him that these matters were none of his concern.

That money is gone. The only accounting Carlyene provided the court was that she utilized all the funds for household expenses. She did not provide line-item entries describing the precise distribution of these funds. Generally, she simply claims to have utilized all the funds to keep the household running and to pay medical expenses. During court arguments, her attorney opined that the money could have been utilized to finance the numerous cruises they took subsequent to Gene's accident. However, there was no evidence introduced at the trial relative to cruise expenses. Gene testified that he had a difficult time believing this claim because he had the $4,120 monthly income, which was an amount substantially in excess of the total household income prior to his accident, because his medical bills were then being paid in full through workers' compensation benefits, and because the Zweigs had no house payment, no car payments, and no credit card payments.

At some time after the accident, Gene and Carlyene ceased living together as husband and wife, although they remained in the same residence.

On April 11, 1997, Carlyene filed a petition seeking a dissolution of the marriage. A reconciliation attempt occurred in 1997 or 1998, at which time Carlyene sold marital furniture in anticipation of a marital residence move to Arizona. That attempt failed, and the parties renewed their interest in obtaining a divorce.

Carlyene continued to live in the marital residence until October or November 1999. Carlyene moved to Waterloo, Illinois, planning to reside with a daughter, but she ended up only living with her daughter for approximately one week. She moved from her daughter's home into the home of a male friend, with whom she had developed a personal relationship allegedly within that one week. She contributes $1,600 per month toward the living expenses she and her male friend incur. The couple has no present marital plans.

Gene remains a quadriplegic. He lives in the marital residence, which has been modified to meet his needs. He has an in-home nurse for about four hours each day, which costs about $1,400 per month. Gene continues to take care of his health, although he must be hospitalized a couple of times each year for various ailments. The

expenses of Gene's hospitalizations are almost completely covered by Medicare Complete. His other medical expenses are covered at about 80%. In-home nursing care is paid entirely by Gene. His affidavit of assets and liabilities lists monthly out-of-pocket expenses at $3,039. In testimony, he indicated that some of these expenses were somewhat inflated and that a more accurate amount for out-of-pocket expenses is $2,636. His present monthly income is $2,400. He anticipates, based upon his conversations with various treating physicians, that his medical condition will deteriorate over time. If Gene's medical situation ultimately necessitates round-the-clock nursing care, he will pay for such care, because he has no desire to be placed in a nursing home. A life-care plan prepared on Gene's behalf determined that he could need as much as $180,019.72 per year for medical and medical-related expenses. Carlyene testified that she did not believe that Gene would ever spend that level of income on his own care. Gene testified that he might do so, if the expenditures would result in helping him "quite a bit," but he acknowledged that he had not spent any money on items referenced in the plan in the six to eight months since he had received the plan. The expert who created Gene's life-care plan also compiled lists of charges for area nursing homes for quadriplegic care. The lowest cost was $73.43 per day, and the highest cost was $167 per day.

Carlyene suffers from allergies, asthma, and bronchitis. She also suffers from some type of movement disorder resulting in hand tremors and uncontrolled head motion, for which she is presently under treatment at Washington University School of Medicine and for which she might need brain surgery. She takes several medications for her conditions. Carlyene's health insurance through Gene's union lapsed on July 1, 2001. She testified that because she was not yet old enough for Medicare, she obtained her own private insurance at an annual cost of approximately $3,911, or about $326 per month. She averages about $293 per month in medical costs and $550 per month in prescription costs.

On January 10, 2002, the trial judge entered an order distributing the parties' property. He allowed each party to retain ownership of his or her vehicle and to retain any personal property within his or her possession. The court determined that Carlyene took the $324,442 in investment funds at a time when the marriage was undergoing an irreconcilable breakdown and that, therefore, she should be charged with the dissipation of marital assets in that amount. The value of the house was in dispute because Carlyene provided testimony or evidence that the property was worth anywhere from $60,000 to $337,000 and Gene provided testimony and evidence that the property was worth between $176,000 and $186,000. Carlyene desired this home, suggest-

ing that Gene could move to a nursing home, but the trial court determined that because Carlyene had dissipated marital funds, because Gene wanted to remain in the home and because the home had been modified to meet his medical needs, the home should be awarded to Gene at the value to which he testified, $186,000. The judge found that the ongoing income of the parties was a marital asset, ordering Gene to pay Carlyene $875 per month as her share of the marital income, to be reduced to $787 per month when Carlyene turns 65 and begins receiving her pension. Carlyene received her $32,000 IRA account, and Gene received his $9,000 IRA account. The income from the personal injury settlement, $875,128, was to be divided equally between them. Regarding the corpus of the settlement, in a lengthy discussion, the trial court considered all the relevant statutory factors, as well as Gene's pain, suffering, and disability, and concluded that the personal injury settlement of $1,744,843 should be awarded to Gene. Carlyene was awarded prescription reimbursement expenses of $531.32 but was denied a $400 reimbursement for expenses associated with a vacation to Aruba. Each party was ordered to be responsible for his or her own health insurance and attorney fees.

On November 1, 2002, the trial court denied Carlyene's posttrial motions.

From these two orders, Carlyene appeals. On appeal, she argues that the trial court should not have found that she had dissipated marital assets because the time during which she allegedly had dissipated the assets was before she filed the divorce petition and before the parties physically separated. She also argues that the trial court's statement that she either hid or disposed of these assets was an erroneous statement and should be reversed. She contends that in allocating the parties' assets the trial court erroneously relied upon the expert who had created Gene's life-care plan. Finally, she argues that the trial court's allocation of assets was improper and should be reversed.

■ We first look at the more specific issue involving the dissipation of marital assets. In dividing marital property, the trial court is required to consider the dissipation of the value of marital and nonmarital property. 750 ILCS 5/503(d)(2) (West 1996). Dissipation has been defined by the Illinois Supreme Court as the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497, 563 N.E.2d 494, 498-99 (1990), quoting *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210 (1987). Whether a certain utilization of marital assets constitutes dissipation

is a question of fact. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 984, 605 N.E.2d 670, 683 (1992). The use of the marital funds in issue for legitimate living expenses is not a dissipation of assets. *In re Marriage of Tietz*, 238 Ill. App. 3d at 983, 605 N.E.2d at 683. "The spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the marital funds were spent." *In re Marriage of Tietz*, 238 Ill. App. 3d at 983, 605 N.E.2d at 683. "General and vague statements that the funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation." *In re Marriage of Petrovich*, 154 Ill. App. 3d at 886, 507 N.E.2d at 210. The explanation provided by the spouse accused of dissipation requires the trial court to make a credibility determination. *In re Marriage of Tietz*, 238 Ill. App. 3d at 983-84, 605 N.E.2d at 683. Because the question of dissipation is a factual one, we will not disturb a trial court's finding of dissipation unless the trial court abused its discretion. See *In re Marriage of Petrovich*, 154 Ill. App. 3d at 886, 507 N.E.2d at 210. An abuse of discretion occurs only when no reasonable person could adopt the trial court's view. *In re Marriage of Hahin*, 266 Ill. App. 3d 168, 171, 644 N.E.2d 4, 7 (1994).

There is no question that Carlyene fails in her vague attempts to establish that the money at issue was spent on household and medical expenses. She provided no evidence of where one cent of the money was spent. She produced no documentary proof of her expenditures. Surely there was a trail created by her claimed expenditure of more than $300,000. Credit card receipts, bank statements, bills, or cancelled checks are only a few of the documentary possibilities. Nothing was entered into evidence at the trial. Her only "evidence" was her testimony to that effect. Carlyene's testimony was severely tainted by her perjurious testimony denying any legal attempt to obtain control over Gene's assets and life in general. However, determining that the money was unaccounted for is not the only fact that must be proven.

We must initially determine whether Carlyene took this money at a time when the marriage was undergoing an irreconcilable breakdown. If the issue were controlled by the fact that Carlyene did not file her petition seeking a divorce until six years after Gene's accident, there would be no doubt that the taking of the assets could not be a chargeable dissipation. This is the theory Carlyene advances. Gene contends that because he was not aware that Carlyene was liquidating and spending their investment accounts, the court could properly conclude that the lack of cooperation signaled a breakdown in the marriage. Certainly by 1993 when Carlyene sought legal control over the assets, which forced Gene to ask the court for protection from

Carlyene and her actions, the marriage was undergoing an irreconcilable breakdown. The fact that Carlyene continued living in the marital home and delayed filing for divorce does not mean that the marriage remained sound until she decided to file the petition.

*In re Marriage of Petrovich* supports this conclusion. In that case, the husband was retired from his employment in 1971, and in his retirement he had become an at-home investor. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 884, 507 N.E.2d at 208-09. His wife worked outside the home as a self-employed psychiatrist. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 884, 507 N.E.2d at 208. The Petrovich couple separated in 1979, with the petition for divorce filed in December of 1979. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 884, 507 N.E.2d at 209. Over the years, the wife gave the husband a documented $368,000 for investments in the stock market. He advised her when to write out these checks, and she complied. The husband maintained exclusive control over the accounts and made all the investment decisions. On somewhat rare occasions, he would tell her how the investments were faring. She did not discontinue giving him money for investments until 1981. Unbeknownst to her, by May 1981, their monetary investments had risen in value to more than $2 million. She did not learn this fact until May 1983. In 1982, the husband asked the wife to remortgage the marital home for investment purposes—a request she denied. By the time of the trial in their dissolution proceedings in October 1984, the value of their investment accounts had dwindled from the high of $2 million to only somewhere between $14,000 and $20,000. The husband acknowledged poor investments as the cause for this dramatic drop in value. The husband was unable to identify what he had done with the money provided to him by the wife for investment. He acknowledged that after their 1979 separation, he started moving the money into accounts he had opened in his own name and otherwise moved the money from accounts to "some other places" and that he removed cash from these accounts frequently. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 884-85, 507 N.E.2d at 209. He did not create a monetary trail in his testimony during the divorce proceedings and could not even identify in what companies he had invested the money. In the supplemental judgment for the dissolution of the marriage, the trial court concluded that the husband had dissipated marital funds exceeding $2 million. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 885, 507 N.E.2d at 209.

On appeal, the court affirmed this dissipation finding, concluding that the fact that the wife had given the husband more than $360,000 over the course of the marriage was not in dispute. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 886, 507 N.E.2d at 210. Critical to this

conclusion was that the husband had controlled all the manners and methods of investment without the wife's knowledge. The husband's inability to explain where the money had been placed or what had happened to the investments to cause such a decline in value cemented the appellate court's determination. *In re Marriage of Petrovich*, 154 Ill. App. 3d at 886-87, 507 N.E.2d at 210.

In this case, the bright-line date of the marital separation was not as important as the actions taken by the parties. The wife provided the money both before and after the separation. The investments occurred both before and after the separation. While some of the questionable actions did take place subsequent to their separation, the dominating feature was the husband's control over the investments and his total lack of fiduciary reporting to his wife regardless of whether the news would have been good or bad.

■ In some respects the factual setting of this case is stronger than that which existed in *In re Marriage of Petrovich*. The holding in *In re Marriage of Petrovich* could be extrapolated into inappropriate situations when husbands or wives with dominant control over the finances during a marriage make suspect investment decisions, when considered with the benefit of hindsight. In this case, Carlyene seized control of the assets at a time when it became necessary to do so— when Gene had his horrific accident. What she did with that power remains a mystery, since the money is apparently gone and there is no record of its demise. Further attempts to seize even more control through the court system and without Gene's consent failed when Gene protested. Gene was completely unaware of Carlyene's financial transactions and testified that if he inquired about the money, Carlyene deflected the conversation and provided no answers. Even after the failed court attempt, when it was clearly obvious that the couple was at odds with each other, Carlyene continued living in the marital home. Only finding dissipation in actions taken by Carlyene after she had filed for divorce would countenance absurd results, given the marital situation. An irreconcilable breakdown of a marriage does not necessarily require a separation or a filing for divorce by one spouse.

Carlyene cites this court's decision in *In re Marriage of Hazel*, 219 Ill. App. 3d 920, 579 N.E.2d 1265 (1991), in support of her cause. Without delving into every aspect of that case, the case actually could be cited in the contrary argument, because the appellate court acknowledged that dissipation could be found five months prior to the date when a petition for divorce was filed. *In re Marriage of Hazel*, 219 Ill. App. 3d at 922, 579 N.E.2d at 1267. We were concerned that if accepted, the dissipation argument advanced would require courts to analyze every financial transaction over the course of the marriage

without regard to a time when the marriage could be described as undergoing an irreconcilable breakdown. *In re Marriage of Hazel*, 219 Ill. App. 3d at 921-22, 579 N.E.2d at 1266-67.

Each dissipation situation is individual and requires a careful factual analysis. We find that the trial court made such an analysis and that the trial court's determination that Carlyene should be charged with the dissipation of marital assets does not constitute an abuse of discretion.

■ Carlyene also argues that the trial judge's finding that Carlyene possibly "secreted" away the money in question was improper speculation. The trial judge made this statement because of the evidence he heard. Specifically, he heard testimony that household income prior to this accident was in the $2,000-per-month range with no house or automobile loans and no credit card or revolving type of debt. He also heard testimony that after the accident, the income rose to $4,120 per month and that all of Gene's medical bills were being paid by workers' compensation coverage. The money appears to be gone. Carlyene presented no evidence of where the money went. She gave ambiguous testimony that the money was spent on household expenses and medical bills, but she provided no documentary evidence to back up her claim. In light of these facts, the trial judge found that the money had been either spent or "secreted" away. We cannot find that such a statement was purely speculative. The facts support the conclusion that all the money simply could not have been utilized in the illogical manner to which Carlyene testified.

■ We next turn to the broader issue of the division of the marital assets. The trial court's determination relative to property division is only constrained by reason and will not be overturned unless it can be shown that the trial court abused its discretion. *In re Marriage of Siddens*, 225 Ill. App. 3d 496, 500, 588 N.E.2d 321, 324 (1992). The issue for the reviewing court is not whether it necessarily agrees with the trial court's marital asset division. Rather, the issue is whether the trial court acted arbitrarily without employing conscientious judgment or whether, in view of all the circumstances of the case, the trial court exceeded the bounds of reason so that no reasonable person would follow the trial court's position. *In re Marriage of Siddens*, 225 Ill. App. 3d at 500, 588 N.E.2d at 324.

■ Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act requires a marital property division in just proportions. 750 ILCS 5/503(d) (West 1996). A proportional asset division does not require mathematical equality. *In re Marriage of Doty*, 255 Ill. App. 3d 1087, 1097-98, 629 N.E.2d 679, 686 (1994). The trial court may award an unequal distribution of property if it properly applies the section

503(d) guidelines. 750 ILCS 5/503(d) (West 1996); *In re Marriage of Doty*, 255 Ill. App. 3d at 1097-98, 629 N.E.2d at 686. The guidelines to be considered in determining a marital property division include the contribution of a spouse to the marriage, the duration of the marriage, the amounts and sources of each spouse's income, the age, occupation, vocational skills, employability, and needs of each spouse, the reasonable opportunity for each spouse's future acquisition of assets and income, whether the apportionment is in lieu of or in addition to maintenance, the tax consequences of the property division, the dissipation of marital or nonmarital property, any antenuptial agreement of the parties, and the value of the property set aside for each spouse. 750 ILCS 5/503(d)(1) through (d)(12) (West 1996).

■ Initially, Carlyene argues that in allocating the assets between the couple the trial court improperly considered the expert testimony about a life-care plan for Gene. That testimony was provided by Sharon Hughes, who is employed by England & Company and has great experience in working with persons with injured spinal cords. One of the factors that the trial court must consider in determining asset allocation is the age, health, and needs of the parties. 750 ILCS 5/503(d)(8) (West 1996). There was no dispute that Gene's condition renders him totally dependent upon assistance for his daily needs. He has no bowel or bladder control, is unable to get in or out of his bed or chair, and is otherwise physically dependent upon others for all aspects of his life. Sharon Hughes provided her testimony regarding what Gene would require. She was cross-examined by Carlyene's attorney. We find no error in the trial court's consideration of this evidence.

■ Finally, Carlyene contends that the trial court abused its discretion in its marital asset distribution. Taking into account the dissipation findings, the trial court awarded 75% of the assets to Gene and 25% to Carlyene, without factoring in the present cash value of the nontaxable marital income split. The major assets at issue were the home and the personal injury settlement.

In reviewing the trial court's order, we find that the court adequately considered all the elements necessary to a proper determination. The trial court had the opportunity to view the witnesses and consider their demeanor when testifying. Gene received substantially more of the marital assets than Carlyene, but we find no error in looking at the relative status of the parties. As the appellate court noted in *In re Marriage of Murphy*, a case involving a paraplegic:

> "[T]he trial court may consider the pain, suffering[,] and disability of an injured spouse when making a division of property. ***
>
> *** [A]*ll* the risks of loss of income and increased costs of living

and medical expenses that stem from the injury will now be borne by respondent alone. Petitioner leaves the marriage the same way she entered it: an employed, healthy, able-bodied person. *** As a spouse she did suffer, but respondent will live with the paralysis for the remainder of his life. He not only endured pain and suffering at the time of the initial injury but has the ongoing absence of normal bodily function below the chest level with all of the risks and hazards in both health and personal life attendant upon such paralysis. This paralysis was the basis for the personal injury award and that which the trial court could rightfully consider when dividing the marital property." (Emphasis in original.) *In re Marriage of Murphy*, 259 Ill. App. 3d 336, 342-43, 631 N.E.2d 893, 897-98 (1994).

While Gene may not presently be spending the money contemplated in his life-care plan, no one has a crystal ball capable of projecting Gene's future needs. What the trial court knew was that Gene's physicians believed that Gene's condition would worsen over time. The amount of money estimated by Sharon Hughes in the end might not come close to covering Gene's actual costs. Gene must be financially prepared for this possibility.

Despite the disparity in the percentage of assets awarded, Carlyene received a fair amount of assets, including a property distribution in the form of monthly payments for life; $875 per month and will be reduced to $787 per month when she turns 65. She also received $437,564 in a nontaxable lump sum, representing her one-half of the increase in the value of his invested personal injury settlement proceeds.

While a property distribution is meant to be in "just proportions," that does not mean that the division must be equal. *In re Marriage of Murphy*, 259 Ill. App. 3d at 344, 631 N.E.2d at 898. An award of a greater percentage of assets does not necessarily mean that the trial court abused its discretion.

Accordingly, we find that the trial court did not err in dividing the marital assets as it did.

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

MAAG and DONOVAN, JJ., concur.