# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Troske*, 2015 IL App (5th) 120448

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ROBERT E. TROSKE, Petitioner-Appellant, and KAREN M. TROSKE, Respondent-Appellee. |
| District & No. | Fifth District<br>Docket No. 5-12-0448 |
| Rule 23 Order filed<br>Motion to publish<br>granted<br>Opinion filed | January 8, 2015<br><br>February 10, 2015<br>February 10, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a supplemental dissolution order, the appellate court rejected petitioner's arguments that the trial court abused its discretion in awarding respondent wife most of the parties' net wealth, considering the property distribution and assignment of debts, in accepting the parties' stipulation that the issues of maintenance and child support would be determined by using income figures for 2009 where the hearings on ancillary issues took place in 2011 and the order was entered in September of 2012, and in entering its order 18 months after the hearings; furthermore, there was no abuse of discretion in the court's order requiring petitioner to pay part of respondent's attorney fees, there was no indication that the judge was biased against petitioner, and finally, respondent's motion to dismiss the appeal was denied and the judgment was affirmed. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 08-D-1153; the Hon. Elizabeth R. Levy, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Barbara L. Sherer, Amanda G. Highlander, and Kristen Strieker, all of Sherer Law Offices, of Edwardsville, for appellant. |
| | |
| | Curtis L. Blood, of Collinsville, for appellee. |
| | |
| Panel | JUSTICE CHAPMAN delivered the judgment of the court, with opinion. |
| | Presiding Justice Cates and Justice Moore[1] concurred in the judgment and opinion. |

**OPINION**

¶ 1 The husband, Robert E. Troske, appeals a supplemental dissolution order, raising several issues. His primary contentions are that (1) the trial court abused its discretion by awarding the wife, Karen M. Troske, essentially all of the couple's net wealth taking into account both the property distribution and assignment of debts; (2) the court abused its discretion by accepting the parties' stipulation that issues of maintenance and child support would be determined using income figures for 2009 where the hearings on ancillary issues took place early in 2011 and the court's order was entered in September 2012; and (3) the court abused its discretion by entering its order 18 months after the hearings. In addition, Robert argues that the court abused its discretion in ordering him to pay a portion of Karen's attorney fees and that the court was biased against him. Karen filed a motion to dismiss, arguing that this court lacks jurisdiction to consider this appeal. We ordered her motion taken with the case. We affirm the judgment and deny Karen's motion.

¶ 2 The parties began dating late in 1992 or early in 1993, moved in together in November 1993, and were married in June 1995. In 1989, Robert and his previous wife, Mary Jo, purchased a lot with the intent of building a home. Robert and Mary Jo's daughter, Andrea, was born in November 1991. Mary Jo passed away due to cancer in August 1992. The home was completed in 1993. Robert, Karen, and Andrea moved into the home in November 1993 and lived there for the duration of the parties' marriage. Robert and Karen's daughter, Emily, was born in September 1998.

¶ 3 The family home is one of four pieces of real estate involved in the proceedings before the trial court. During their marriage, the parties purchased 75 acres of land along with another couple. They purchased this property (the Ridgeview property) intending to build two homes on it for themselves and develop the rest. Instead, they sold the property through a series of sales. In February 2005, the title company issued a check to Robert in the amount of $505,077. However, only $497,577 was deposited. Robert and Karen used some of the proceeds from the Ridgeview sales to purchase a condominium in Florida. In addition, Robert and his parents

---

[1]Justice Spomer was originally assigned to participate in this case. Justice Moore was substituted on the panel subsequent to Justice Spomer's retirement and has read the briefs and listened to the tape of oral argument.

owned a condominium in Lake of the Ozarks. At trial, questions were raised concerning (1) what happened to the proceeds from the sales of the Ridgeview property; (2) whether the family home was marital property; and (3) whether the marital estate was entitled to reimbursement for contributions to the Lake of the Ozarks condo, which was stipulated to be Robert's separate property.

¶ 4 Robert and Karen began filing separate tax returns in 2007. In November 2008, Robert filed a petition for dissolution. Both parties filed numerous motions requesting various forms of temporary relief. In February 2009, Karen filed a motion for injunctive relief, asking the court to require Robert to pay delinquent property taxes for the family home. She alleged that Robert paid the property taxes on the property since it was purchased but failed to pay the 2007 property tax despite having the financial ability to do so. She attached a take-notice document, dated January 2009, which indicated that the property had been sold due to the tax deficiency and could be redeemed by paying $8,559.14 by May 13, 2009.

¶ 5 In May 2009, the court entered an order restraining both parties from concealing, transferring, or encumbering any marital property and directing Robert to "make every effort" to file his 2007 and 2008 personal and corporate income tax returns within 30 days. The order further provided that the parties' Florida condo was to be listed for sale. Three months later, however, the condo was still not listed. The court entered an order in August 2009 directing Robert to (1) pay the 2008 real estate taxes on the family home and pay for reasonable repairs; (2) pay $2,000 per month in child support; (3) pay $750 per month in maintenance; and (4) list the Florida condo for sale. The court reserved ruling on whether to order retroactive child support and maintenance.

¶ 6 Karen subsequently filed two motions for findings of indirect civil contempt, alleging that Robert failed to pay child support, maintenance, or the expenses he was ordered to pay for both the family home and the Florida condo. Karen also filed a petition for injunctive relief. She alleged that (1) the parties received $497,577 from the sales of the Ridgeview property in February 2005; and (2) Robert received $266,422 in a settlement of a mine subsidence claim involving the family home in May 2008. She further alleged that (1) Robert exercised exclusive control over these funds; (2) she did not know what became of the proceeds from the Ridgeview property; (3) she believed that Robert used the mine subsidence settlement to open two certificates of deposit (CDs); and (4) she believed that Robert would likely waste the funds if not enjoined from doing so. At a hearing on these motions, Robert stated that he used some of these funds to open two certificate of deposit accounts totaling $170,000.

¶ 7 In December 2009, the court entered an order enjoining both parties from accessing the certificates of deposit or disposing of any other marital assets. The court also ordered Robert to comply with several of its previous orders within 14 days. Specifically, the court ordered him to pay maintenance and child support, list the Florida condo for sale, and pay past-due real estate taxes on both the Florida condo and the family home. In January 2010, the court found Robert to be in contempt for failing to list the condo for sale. The court further found that he was not in compliance with other previous orders, but did not make findings regarding the willfulness of his noncompliance.

¶ 8 On February 10, 2010, the court entered an order finding that Robert was in "substantial compliance" with his maintenance and child support obligations. At this point, trial was set to begin February 18, 2010. However, the trial setting was continued numerous times. Robert was represented by multiple attorneys. Both parties continued to file motions for temporary relief,

including additional motions for findings of contempt filed by Karen, a motion for sanctions filed by Robert, and a motion to require Karen to participate in parenting classes. A September 2010 trial setting was continued to allow both parties to complete valuations of their respective businesses. The matter came to trial in January 2011. The court held eight hearings during the first three months of 2011. During the hearings, the parties stipulated to using the information on their 2009 income that they had provided to each other in discovery. The stated reason for agreeing to this stipulation was that both parties wanted to avoid delaying trial even further to allow them time to complete discovery of more recent income information for 2010.

¶ 9        Evidence adduced at the hearings showed that in spite of the court's orders enjoining both parties from disposing of marital assets, Robert had taken substantial sums of money from accounts in his name that were funded with marital assets. The two certificates of deposit which started at $170,000 now totaled $74,381. Robert testified that he took an $85,000 loan against one of the CDs to pay various debts. He stated that at least some were credit card debts to pay for family expenses. The bank deducted $35,000 to pay past-due property taxes on the family home and another $60,000 to repay the loan. Similarly, Robert opened a Charles Schwab brokerage account with $115,000 from the Ridgeview proceeds "to play the stock market." That account was valued at $104,067 late in 2007, but only $300 remained by the time hearings were held early in 2011. Robert's individual retirement account was worth $148,437 late in 2007, but nearly depleted by the time of trial. Robert was asked about specific debits from accounts within his sole control. He testified that they were used for home repairs, paying bills or taxes, or family vacations. However, he could not recall with specificity what any of the withdrawals were for.

¶ 10       Robert testified about his use of the mine subsidence settlement funds and the proceeds from the Ridgeview property. Approximately $156,000 was used to purchase the condo in Florida. Additional funds from the Ridgeview proceeds were used to make improvements and repairs to the family home, pay $17,500 toward credit card debts, and pay $143,000 in capital gains taxes. Robert acknowledged that he transferred $69,000 to a business account. Karen testified that none of the structural damage resulting from the subsidence had been repaired.

¶ 11       The last hearing took place on March 18, 2011. At that time, the court took the matter under advisement. In December 2011, the court entered an order dissolving the parties' marriage and reserving all ancillary issues, including child support, maintenance, and the division of property. On September 12, 2012, the court entered a 40-page supplemental dissolution order. The court expressly found that Robert's testimony regarding disputed and unaccounted-for funds was "simply not credible." The court further noted that there was no evidence to explain the discrepancy between the check issued for the Ridgeview proceeds ($505,077) and the amount deposited ($497,577), a difference of $7,500.

¶ 12       The court found that the Charles Schwab account and the certificates of deposit were marital assets and awarded them to Robert. The court awarded both parties their respective individual retirement accounts as well as all checking and savings accounts in their names. Further, the court awarded Karen $75,000 as an award of additional property.

¶ 13       The parties owned a boat and five automobiles. The court awarded these pursuant to the parties' agreement. The court found both parties' businesses to be marital property. Robert owned an insurance business that acted as a broker between insurance companies and small businesses. Karen owned a construction subcontracting business that installed fixtures, primarily in retail stores. The court awarded each business to the party that owned it.

¶ 14 The court found that the family home was Robert's nonmarital property at the time the parties were married but was subsequently transmuted into marital property. The court noted that neither party provided an appraisal of the home, but each gave varying opinions as to the home's value. The court found that a value of $325,000 (the value given in one of Robert's financial statements) was consistent with the parties' 2005 tax return. The court awarded the home to Karen. Although the court ordered that each party was to be responsible for any debt associated with the items of property awarded to them, the court ordered Robert to make the payments necessary to bring the mortgage and real estate taxes current. The court stated that it was ordering him to do this because he used the mine subsidence settlement funds for purposes other than the property.

¶ 15 The court awarded the Florida condo to Robert and assigned him the remaining mortgage debt on the condo. As with the marital home, both parties gave opinions as to the value of the condo, but neither provided an appraisal. The court noted that after the property was listed, a company owned by Robert's girlfriend offered to buy the condo for $212,000, the precise amount of debt remaining on the mortgage. The court further found that the Lake of the Ozarks property was Robert's nonmarital property and rejected Karen's claim that the marital estate was entitled to reimbursement for expenses associated with the property.

¶ 16 The court found that 20% of Robert's income was just under $2,000 per month and set permanent child support at $2,000 per month. The court determined that child support should be retroactive to January 2009, an issue it had previously reserved ruling on. The court found that the total amount of child support that Robert was required to pay through August 2012 was $64,000. The court directed the parties to calculate the arrearage. The court stated that, in the event they could not reach an agreement, the court would set a hearing to resolve the matter.

¶ 17 The court ordered Robert to pay $36,000 as maintenance in gross, to be paid in installments of $500 per month. The court also determined that its temporary maintenance award should be made retroactive to January 2009 and directed the parties to determine any arrearage. Finally, the court ordered Robert to pay $30,000 of Karen's attorney fees. In support of this order, the court noted that there was great disparity between the parties' earnings and also emphasized the fact that Robert had been found in contempt.

¶ 18 Robert filed his notice of appeal from the supplemental dissolution order on October 9, 2012. The court entered an order determining the arrearages on January 24, 2013. On March 28, 2013, Karen filed a motion to dismiss for lack of appellate jurisdiction. She argued that the court's September 2012 order was not a final and appealable order because the court retained jurisdiction to determine the arrearages of maintenance and child support. Thus, she argued, Robert's notice of appeal was premature. We ordered Karen's motion taken with the case and directed both parties to fully brief the question.

¶ 19 This court has jurisdiction to hear timely appeals from final judgments pursuant to Illinois Supreme Court Rule 303. Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008); *In re Guzik*, 249 Ill. App. 3d 95, 97-98 (1993). A judgment is not final or immediately appealable unless it "fixes absolutely and finally the rights of the parties" so that "the only thing remaining is to proceed with execution of the judgment." *In re Guzik*, 249 Ill. App. 3d at 98 (citing *Flores v. Dugan*, 91 Ill. 2d 108, 113 (1982)). However, if an order leaves matters for future determination that are "merely incidental" to the rights and obligations that have been determined, the order is final and appealable despite the reservation to rule on incidental matters later. *In re T.M.*, 302 Ill. App. 3d 33, 37 (1998).

¶ 20     In the context of dissolution proceedings, ancillary issues such as child support, maintenance, custody, and property division are part of a single claim. As such, orders entered resolving some of these issues are not final or appealable until the court resolves all ancillary issues. *In re Marriage of Mackin*, 391 Ill. App. 3d 518, 520 (2009). Child support "is a matter of substantial controversy." *In re Marriage of Mackin*, 391 Ill. App. 3d at 520. Thus, where the issue is not fully resolved, there is no final and appealable order. *In re Marriage of Mackin*, 391 Ill. App. 3d at 520. As Karen correctly notes, this rule applies to retroactive child support obligations with as much force as it applies to future obligations. *Franson v. Micelli*, 172 Ill. 2d 352, 357 (1996).

¶ 21     It is important to note, however, that the *Mackin* and *Franson* cases both involved situations in which a party filed an appeal before the trial court had fully determined the amount or duration of child support a party was required to pay. See *Franson*, 172 Ill. 2d at 356 (explaining that the trial court reserved ruling on whether the father should be obligated to make any retroactive child support payments); *In re Marriage of Mackin*, 391 Ill. App. 3d at 520 (stating that although the court determined the mother's child support obligations for a period of 180 days after the order appealed, the court reserved jurisdiction to determine her "future obligation for child support" after that time). In other words, the courts in those cases did not fully and finally determine the parties' rights and obligations concerning child support in the orders appealed.

¶ 22     Here, by contrast, the order appealed did determine Robert's past and ongoing obligations to pay child support and maintenance. The only thing it did not determine was how much support and maintenance Robert paid prior to entry of the order, a determination necessary in order to enforce the judgment. The court reserved jurisdiction to settle this question if the parties were unable to do so on their own; however, the order appealed fixed the rights and obligations of both parties. As such, it was a final order, and we have jurisdiction over this appeal. We therefore deny Karen's motion to dismiss.

¶ 23     Turning to the merits, Robert first argues that the court abused its discretion in distributing the parties' property and assigning their debts. He contends that the court's distribution resulted in an award of 104% of the couple's wealth to Karen and negative 4% to Robert. This assertion overstates the extent to which the court's distribution favored Karen. Moreover, we find that under the facts presented, the unequal distribution actually ordered by the court was equitable.

¶ 24     In support of his claim that Karen was awarded 104% of the marital estate, Robert includes in his brief a table of the assets and debts awarded to each party. According to his calculations, the debt assigned to him exceeds the value of the property awarded to him by $30,624, while the value of the property awarded to Karen exceeds the debt assigned to her by nearly $740,000. The table, however, does not accurately reflect the record. Robert includes in the list of debts assigned to him the $30,000 he was ordered to pay toward Karen's attorney fees, $167,806 in "joint taxes owed," and $171,913 remaining on the mortgage for the family home. Karen's attorney fees are not a marital debt, and the lion's share of the tax deficiency came from the separate tax returns Robert filed in 2007, 2008, and 2009. The court did not assign the mortgage on the family home to Robert; however, the court did order him to make payments to bring the mortgage current.

¶ 25     In addition, Robert includes the $74,381 remaining in the CD accounts among the list of assets assigned to Karen even though it was actually assigned to him. The court directed him to

use these funds to pay the past-due amounts on the mortgage and property taxes. However, as just discussed, Robert also includes these payments as debts assigned to him to be paid from property awarded to him.

¶ 26 Taking all of these factors into account, the division of property still favors Karen. As both parties note, however, property distribution need not be mathematically equal; rather, it must be in proportions that are just and equitable. *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 599 (2003) (citing 750 ILCS 5/503(d) (West 1996)). On appeal, this court will not set aside a trial court's distribution of property absent an abuse of the trial court's discretion. An abuse of discretion occurs when no reasonable person could take the view taken by the trial court. *In re Marriage of Zweig*, 343 Ill. App. 3d at 599.

¶ 27 In this case, the court expressly found that Robert's testimony was not credible regarding the funds from the Ridgeview sales, his Charles Schwab accounts, the certificates of deposit, and the mine subsidence settlement check. In support of its credibility determination, the court highlighted Robert's testimony regarding transactions involving his girlfriend, Shari. Robert and Shari lived in a $599,000 home with Shari's two children. Robert testified that Shari paid for the vacations they took together. However, the court found no evidence to support Robert's contention that Shari was financing their lavish lifestyle alone. In addition, Robert paid Shari substantial sums of money−allegedly as repayments of loans she had made to his business−at a time when he was in arrears on his child support and maintenance obligations. When Robert finally complied with the court's orders to list the Florida condo for sale, the only two offers came from a company wholly owned by Shari. One of the offers was for the precise amount of the debt remaining on the condo.

¶ 28 The court also pointed to Robert's testimony regarding payments made from the Ridgeview proceeds and mine subsidence settlement. The court acknowledged that much of the Ridgeview money went to paying for repairs and improvements to the family home and paying taxes, but the court noted that Robert also testified to using the funds from the mine subsidence settlement to make some of these same payments. The trial court is in a better position than this court to assess the credibility of witnesses. *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991). Here, there was ample evidence in the record to support the court's finding that Robert's testimony was not credible.

¶ 29 Moreover, the court was entitled to take into account Robert's failure to comply with multiple orders directing him to pay the past-due taxes and mortgage payments on the family home and to refrain from transferring marital assets as well as the impact his noncompliance had on the assets and debts to be distributed. Had Robert complied with these orders, the past-due portion of the mortgage debt assigned to him would not have existed and the accounts awarded to him would not have been depleted.

¶ 30 Robert argues that the court's distribution amounts to an implicit finding that he dissipated assets, while Karen argues that the court found that Robert still had the funds from the mine subsidence settlement and the Ridgeview sale, and the depleted accounts or property purchased with these funds. She argues that the court awarded this property to Robert. We note that the court did not explicitly make either of these findings. It is clear, however, that the court did find that Robert still had either the missing funds or the benefit of those funds.

¶ 31 To the extent this finding can be interpreted as a finding of dissipation of marital assets, Robert argues that it was improper because there was no evidence that the dissipation occurred

after there was an irreversible breakdown of the parties' marriage. See *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 830 (1994). We disagree.

¶ 32     Robert is correct in noting that the court never explicitly determined a point in time when the marriage had broken down. He is also correct in asserting that *some* of the funds were depleted before the parties were separated. As Robert points out, the parties received $505,077 from the Ridgeview property early in 2005, which was two years before they began filing separate income tax returns and over three years before Robert filed a petition for dissolution. However, the mine subsidence settlement check was received in 2008, after the parties began filing separate tax returns and only four months before Robert filed for dissolution. In addition, much of the depletion of the accounts funded with proceeds from both of these sources as well as the depletion of Robert's individual retirement account took place after 2007. Indeed, as previously discussed, much of it occurred while these proceedings were pending before the trial court and in violation of court orders. We find ample support in the record for the court's conclusion that Robert still had either the unaccounted-for funds or the benefit of those funds. We further find that the court properly took this into account in distributing the property and assigning the debts.

¶ 33     Robert next argues that the court abused its discretion in accepting the parties' stipulation that the 2009 income figures would be used. He acknowledges that he did not request that the court reject the stipulation. This fact is fatal to his claim.

¶ 34     To overrule a stipulation, a party must make a timely objection and demonstrate that the stipulation is untrue or unreasonable. *In re Marriage of Tantiwongse*, 371 Ill. App. 3d 1161, 1163 (2007). Robert advances two arguments in support of his claim that the court's acceptance of the stipulation warrants reversal in spite of his failure to object. First, he points to his attorney's attempts to cross-examine Karen regarding her income in 2010 and 2011. Karen testified at trial that her current salary from her business was $28,000 per year and she did not remember her income in 2009, although we note that she did provide the court with documentation of her 2009 income. Robert argues that his attorney's cross-examination of Karen related to this testimony was "much like an objection or reconsideration of the stipulation." We are not persuaded. As we stated earlier, the parties agreed to use the 2009 figures so that the matter could proceed to trial without further delay to allow for discovery related to the 2010 income. Robert could cross-examine Karen about the testimony she gave related to her income early in 2011 without having to fully develop evidence related to both parties' post-2009 income. Moreover, we do not believe that a trial court errs by failing to make a ruling it has not been asked to make.

¶ 35     Second, Robert argues that the court abused its discretion in accepting the parties' stipulation at all. As he points out, a "trial court has the *discretion* to determine the validity and reasonableness of a stipulation." (Emphasis added.) *Kew v. Kew*, 198 Ill. App. 3d 61, 64 (1990). Trial in this case took place during January, February, and March of 2011. This was before the parties' 2010 taxes would be prepared and thus before both parties could complete discovery regarding each other's 2010 income. Under these circumstances, the agreement to use the 2009 information was not unreasonable. If Robert believed the 2010 income was significantly different from the 2009 income information, he did not have to agree to the stipulation.

¶ 36     Robert's next contention is that the court abused its discretion and violated a local court rule by delaying its ruling in this case until 18 months after the final hearing. Karen points out

that he cites no authority for the proposition that he would be entitled to relief on this basis. She also argues that the delay can be explained by the complexity of the case and the volume of evidence the court had to consider.

¶ 37        We do not condone the court's delay in ruling in this matter. However, we find no merit to Robert's contention that the delay warrants reversal for new hearings. The only authority Robert cites to support his claim is an unpublished decision of this court. Unpublished orders are not binding authority and may not be cited as such. Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011). We further note that the case cited would not support Robert's contention even if it could be cited as binding authority. There, this court reversed the trial court's decision and remanded for further proceedings on other grounds. We directed that the case be assigned to a different judge on remand in part because the trial judge took 17 months to rule. However, we explicitly stated that we were addressing these issues because the cause had to be remanded on other grounds. See *In re Marriage of Edwards*, 2012 IL App (5th) 100132-U, ¶ 66. We find that the court's delay in ruling does not require reversal.

¶ 38        Robert next contends that the trial court abused its discretion by awarding Karen maintenance in gross. We disagree. The propriety of awarding maintenance as well as the amount and duration of a maintenance award are matters left to the discretion of the trial court. We will not reverse the court's determination absent an abuse of that discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). Robert argues that the award of maintenance in this case (1) was unreasonable in light of the unequal property distribution and (2) was based on out-of-date income evidence. We have already addressed Robert's arguments regarding the propriety of the court's property distribution and use of the 2009 income evidence. The property distribution took into account the court's finding that Robert retained hidden marital assets or the benefit of those assets. The record does not support the notion that Karen was awarded additional property in lieu of maintenance. Further, as we have already concluded, Robert agreed to the use of the 2009 income evidence. We find no abuse of discretion.

¶ 39        Finally, Robert argues that the court's ruling was the result of judicial bias against him. He acknowledges that trial judges are presumed to be fair and impartial. See *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). He argues that this presumption can be overcome in this case due to what he calls a "grossly unfair result" as well as the court's comments related to his credibility and the fact that he lives with his girlfriend, Shari. We disagree. Robert's relationship with Shari was relevant to resolution of Karen's allegations that Robert was hiding marital assets. We have already found that the record supported the court's findings in this regard. Unfavorable comments regarding the credibility of a party are not sufficient to overcome the presumption against judicial bias. *Eychaner*, 202 Ill. 2d at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Adverse rulings against a party are likewise insufficient to overcome this presumption. *Eychaner*, 202 Ill. 2d at 280. We find no basis to support Robert's claim of judicial bias.

¶ 40        For the reasons stated, we deny Karen's motion to dismiss the appeal and affirm the supplemental dissolution order.

¶ 41        Affirmed.